**Edna FALL, as Administratrix of the Estate of Phillip Fall, Deceased, Appellant,**

v.

**ESSO STANDARD OIL COMPANY, Appellee.**

No. 18578.

United States Court of Appeals
Fifth Circuit.

Dec. 13, 1961.

Rehearing Denied Feb. 22, 1962.

Arthur Roth, Miami, Fla., for appellant.

Louis Kurz, Jr., Jacksonville, Fla., Walter X. Connor, New York City, for appellee.

Before RIVES, BROWN and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This Jones Act litigation turns on the effect of a seaman's possession of a switchblade knife. Jimmie Murphy, a young messman in the crew of the S. S. Esso Augusta, stabbed and fatally wounded Phillip Fall, the ship's marine electrician, while the ship was tied to the Esso Refinery's docks in Baton Rouge, Louisiana.

Esso's schedule calls for three months on duty and one month off with pay. Murphy completed his first tour of three months but did not complete his second tour. He left the ship at Mobile and returned to his home in North Carolina: according to the plaintiff, "because had some trouble with the chief steward"; according to the defendant, because of "incompatibility between the steward and Murphy and nothing more". Several months later the defendant reemployed Murphy and assigned him to the Esso Augusta. While his ship was in Mobile, Murphy purchased a switchblade knife. He bought it, he said, because he had always wanted one and it was "pretty". On the tanker he used to keep the knife on a makeshift table by his bunk; "it was too big to tote around". He had no use for his knife as a messman; he used it to pare his toenails. His immediate superior, the chief steward, had seen or might have seen the switchblade knife daily during sanitation inspections. On this point the record is unclear; he had seen the knife but was not sure that it was a switchblade knife.

The defendant introduced evidence to show that Murphy came from a religious background, had received part of his education in church academies, and had the reputation of being a polite, quiet, unassuming boy—a description short of accurately describing Murphy's character on the night of April 24, 1957. That night the crew had shore leave. Murphy, without waiting to eat, left ship about seven in the evening. He went to several bars. At Mary's Bar, Mary and he were sitting together, talking, when Fall came in. Fall jerked Murphy around and asked, "What in the hell are you doing talking to my girl". They got into "a little scrap" which Mary broke up. Later that night Murphy and Fall took the company bus back to the ship. There was more trouble. A sharp turn caused Murphy to fall off the front seat. In seaman-like terms, Fall told Murphy not to "fool around with the driver". They engaged in an exchange of words something less than complimentary. They were still arguing over who could whip whom when the bus reached the Esso refinery, a fenced-in enclosure protected by security guards at a gate about a mile and a half from the ship. Murphy and Fall scuffled after leaving the bus, but the driver and two of the guards separated the men and escorted them to the gang plank, apparently to prevent further trouble. The guards testified that the men looked as if they had been drinking but neither was drunk. We may safely assume, however, that their standards for determining drunkenness in seamen are lower than ordinary police standards.

Murphy, muttering to himself, went through the messroom to his quarters. It was two-thirty in the morning. Schuler, an assistant engineer, and two of the crew were drinking coffee in the petty officers mess. In a matter of moments, Murphy came back through the mess with the switchblade knife in his hand. Schuler asked, "What are you doing with that knife?" Murphy said that he was "going to get the electrician", and went on through the mess. Schuler followed, but not soon enough. When he reached Fall's quarters he found Murphy and Fall struggling, Murphy with the open knife in his hand. Fall, forty-six years old, weighed about a hundred and forty pounds; Murphy, nineteen years old, weighed about two hundred pounds. Schuler managed to break in between the two. Fall grabbed his chest and ran down the passageway, leaving a trail of blood up the gangway. There he collapsed. He died on the way to the hospital.

The defendant argues that Fall persistently mistreated Murphy. Murphy testified, however, that before the scrap,

although he knew Fall by sight as the electrician, he did not even know his name. He said: "The electrician and I have never had any serious arguments or trouble between us prior to last night. He and I weren't too friendly with each other though, because he always considered me like a dog or a lowly messman."

Fall's widow, as administratrix, sued Esso Standard alleging, as her first cause of action, negligence under the Jones Act, 46 U.S.C.A. § 688, and as her second cause of action, unseaworthiness under the general maritime law. The claim under the Jones Act includes an assertion that the death was caused by the defendant's "failure, neglect or omission" to furnish a seaworthy vessel. On the defendant's motion, the district court struck the references in the complaint's first cause of action as to unseaworthiness and dismissed the complaint as to the second cause of action alleging unseaworthiness. The court also struck the allegations in the complaint which contend that the decedent's claim for pain and suffering caused by unseaworthiness survived in the estate. The court allowed an amendment to the complaint to include a claim for funeral expenses, but did not rule on the merits of the claim because of the jury verdict for the defendant.

Each party moved for a directed verdict. The motions were denied. The jury gave a verdict for the defendant on the question of negligence under the Jones Act. The plaintiff appeals from (1) the trial judge's order dismissing the complaint as to unseaworthiness, (2) the final judgment in favor of the defendant, and (3) the ruling on funeral expenses.

The distinguishing characteristic of a switchblade knife is that with the press of a button its blade extends and is securely locked open. The knife becomes a stiletto. The handle of Murphy's knife is four and a quarter inches long and shaped like the hilt of a dagger. The blade is heavy steel, three and a half inches long; the last two inches narrow to a point. The point is sharp. Blade out, the knife is an eight-inch stiletto—unsuitable as a screw driver, perhaps usable for paring toe-nails, and highly suitable for stabbing an opponent in a fight.

The complaint and the pre-trial depositions show that the plaintiff's counsel constructed his case on the theory that Murphy's switchblade knife was a dangerous weapon. On that assumption and on evidence showing the defendant's failure to take any action with regard to the knife, counsel contended that the defendant was liable under the Jones Act for negligence and under the general maritime law for failure to furnish a seaworthy vessel. Half of the case collapsed when the trial judge dismissed the complaint as to unseaworthiness. The other half fell apart during the trial when the district judge made it clear that, as a matter of law, he regarded the knife as a useful tool and not a dangerous weapon per se. Consistent with this view, the district judge refused to grant any of the plaintiff's requested charges referring to the knife as a dangerous weapon and gave no instructions with regard to "dangerous weapons" or "switchblade knives". Instead, he instructed the jury:

> "Now, there was some talk here in the beginning of this case about negligence based on the failure to inspect this crewman Murphy's quarters, or pick up his knife, or matters of that sort—confiscate his knife. That issue of negligence is not submitted to you. I have determined as a matter of law that that question should not (537) be submitted to you."

Just before withdrawing this crucial issue from the jury, the district judge stated:

> "In order for the plaintiff to recover damages in this case, it is incumbent upon her to prove by a preponderance of the evidence that the defendant's responsible agents knew, or reasonably should have known, that its employee, Jimmie Murphy, was dangerous to other persons and likely to assault or commit violent

acts upon his fellow employees at the time in question."

Just after withdrawing the dangerous weapon issue, the district judge instructed the jury:

"The issue of fact that I want you gentlemen to decide is whether or not it was negligence under all the circumstances for the Esso Standard Oil Company, through its agents— either through the security guard at the gate who let the men in at the gate of the Refinery, or through the guard who drove the jitney bus down to the turn-around from the gate, or through the man who was called out by the jitney driver to talk to these two men when they got back to the ship there, or through the negligence of the third officer or the third engineer, Schuler, or some other person aboard the ship there—whether under all the circumstances this assault by Murphy on Mr. Fall should reasonably have been anticipated. Would a reasonably prudent person under the circumstances have anticipated that there was going to be such an assault and taken proper steps to prevent it."

 A useful tool may be a dangerous weapon. Lizzie Borden took an axe. A weapon may be a useful tool. The trial judge cleaned fish with his switchblade knife.[1] But an axe belongs in a tool shed; a seaman cannot bring one aboard ship. A switchblade knife may be appropriate in a fishing box; a messman cannot lawfully bring one aboard ship and, in this case, making bad matters worse, keep it on a table near his bunk, presumably for instant use. Because of the dual nature of certain instruments as tools and weapons, the determination of the character of the instrument for purposes of the litigation is usually one for the jury. If the instrument is a dangerous weapon, the jury must then decide, in the circumstances of such a case as the one at bar, whether the shipowner breached his duty to protect the crew against the consequences of a seaman's possessing a dangerous weapon aboard ship.

Two federal statutes, read together, are dispositive of this case. One of these, the Switchblade Act, was not called to the attention of the district judge, an omission that may account for the tenor of the charges; in a colloquy with the attorneys, the district judge commented on the statutory prohibition of sheath knives and the absence of a statute defining a switchblade as a dangerous weapon.

18 U.S.C.A. § 2277 provides, in part:

"(a) Whoever brings, carries, or possesses any *dangerous weapon*, instrument, or device, or any dynamite, nitroglycerin, or other explosive article or compound on board of any vessel registered, enrolled, or licensed under the laws of the United States, * * * without previously obtaining the permission of the owner or the master of such vessel * *.

" * * * shall be fined not more than $1,000 or imprisoned not more than one year, or both."

The "Shipping Articles", which a master and his crew are required by law to sign,[2] provide: "And it is hereby agreed as follows. * * * No liquor, dangerous weapon or contraband article shall be brought on board. Any such property brought on board by any member of the crew will be confiscated by the master". The "Forecastle Card", required by law to be posted in a place on the ship accessible to the crew,[3] in bold face capital let-

---

1. As appears in a colloquy among counsel and the trial judge, the trial judge, one of the defendant's counsel, and the plaintiff's counsel each has carried a switchblade knife on fishing trips. The argument that a switchblade knife is a handy tool for seamen in case of an accident, such as a seaman's becoming entangled with lines, is similarly applicable to sheath knives. The use of sheath knives aboard vessels by seamen has been prohibited since 1866. Act of July 27, 1866, C. 286 §§ 1, 2, 14 Stat. 304, 46 U.S.C.A. § 710.

2. 46 U.S.C.A. §§ 563–568, 713.

3. 46 U.S.C.A. § 577.

ters provides: "No dangerous weapons or grog allowed, and none to be brought on board by the crew."

In 1958 Congress decided that the use of switchblade knives as cheap, efficient, convenient weapons required prohibitory action at the national level. Pub.L. 85–623, Aug. 12, 1958, 72 Stat. 562, 15 U.S.C.A. §§ 1241–1244. The Act was adopted some months after Fall's death and some months before the trial of this case. It is therefore, virtually a contemporaneous, authoritative declaration by Congress itself that switchblade knives are weapons of a particularly dangerous nature. Section 2277 does not define "dangerous weapon" nor qualify it in such a way as to limit its scope to weapons considered dangerous at the time the law was enacted. In these circumstances, it only makes sense to resort to a later statute, even one not directly related to the statute to be construed. See Farmers' & Mechanics' Nat. Bank v. Dearing, 1875, 91 U.S. 29, 23 L. Ed. 196; Johnson v. Southern Pacific Co., 1904, 196 U.S. 1, 25 S.Ct. 158, 49 L.

4. 15 U.S.C.A. § 1242 provides: "Whoever knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both."

5. 15 U.S.C.A. § 1243 provides: "Whoever, within any Territory or possession of the United States, within Indian country (as defined in section 1151 of Title 18), or within the special maritime and territorial jurisdiction of the United States (as defined in section 7 of Title 18), manufactures, sells, or possesses any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both."

6. Senate Report No. 1980, July 28, 1958, to accompany H.R. 12850, 85th Cong., 2d Sess. 2 U.S.Code and Administrative News, 85th Cong., 2d Sess., 1958, p. 3435. The report quotes the following language from a special study of juvenile delinquency made by a Subcommittee of the Committee on the Judiciary of the Senate (Sen.Rept. No. 1429, 85th Cong., 2d Sess.) :

Ed. 363. Section 1 of the Act, 15 U.S.C.A. § 1241(b), defines the term "switchblade knife" as "any knife having a blade which opens automatically—

"(1) by hand pressure applied to a button or other device in the handle of the knife, or

"(2) by operation of inertia, gravity, or both. Pub.L. 85–623 § 1, Aug. 12, 1958, 72 Stat. 562."

Section 2, 15 U.S.C.A. § 1242 prohibits the manufacture for, or transportation or distribution, of switchblade knives.[4] Section 3 prohibits the manufacture, sale, or possession of any switchblade knife within any territory or possession of the United States or within the special maritime or territorial jurisdiction of the United States.[5] Persons violating these sections are subject to a fine of not more than $2,000 or to imprisonment of not more than five years, or both.

In describing the need for the legislation, the Senate Report, on the bill by the Committee on Interstate and Foreign Commerce,[6] explains that twelve states

"The subcommittee's investigation disclosed that many of these knives were manufactured abroad and distributed by firms in this country who handle numerous items in addition to switchblade knives.

"It was established that these items were being widely distributed through the mail by distributors to the various States that had local laws prohibiting possession, sale, or distribution of switchblade knives. This fact, the subcommittee feels, points out the need for Federal control of the interstate shipment of these instruments, since local legislation is being systematically circumvented through the mail-order device.

"In the United States 2 manufacturers have a combined production of over 1 million switchblade knives a year. Both concerns are important cutlery manufacturers and the manufacture of switchblade knives represents only a small part of their business. It is estimated that the total traffic in this country in switchblade knives exceeds 1,200,000 per year.

"The questionnaires returned by police chiefs throughout the country indicate that many switchblade knives have been confiscated from juveniles. The police

have already enacted legislation prohibiting the manufacture, sale, or possession of switchblade knives. The measure, however, "goes beyond merely helping states in local law enforcement":

"The switchblade knife is, by design and use, almost exclusively the weapon of the thug and the delinquent. Such knives are not particularly adapted to the requirements of the hunter or fisherman, and sportsmen generally do not employ them. It was testified that, practically speaking, there is no legitimate use for the switchblade to which a conventional sheath or jackknife is not better suited. This being the case, your committee believes that it is in the national interest that these articles be banned from interstate commerce."

It is now settled beyond doubt that a switchblade knife is a dangerous weapon, and if Murphy's possession of his knife had occurred after the effective date of the Switchblade Act we should feel compelled to hold, as a matter of law, that possession of such a knife was a violation of Section 2277. But the stabbing took place before the Act was adopted. Accordingly, we do not say, *as a matter of law*, that the knife was a dangerous weapon. We say, as the Act indicates, that a fair and reasonable interpretation of the term "dangerous weapon" permits a jury to find that Murphy's knife came within the statutory meaning.

Apparently without benefit of the Switchblade Act, the chief mate nevertheless had a firm understanding of the appropriate action that should be taken

with regard to a seaman's possessing a switchblade knife on board ship. In his pre-trial deposition he said:

"Q. Would you consider a switchblade knife a dangerous weapon? A. Yes, I would.

"Q. If you had known that it was aboard the vessel, what would you have done? A. Well, if I had known it was aboard the vessel, I would have notified the Captain and he either would have gone back with me, or sent me back, to take it away from him. They are not allowed on ships; a sheave (sic) knife or a switchblade knife." (Nelson's Deposition, P. 34–36, See Appendix.)

"Q. That's part of the foc'sle card, that you are not allowed to have dangerous weapons aboard? A. That's right. But that's the first I knew or heard about a switchblade knife. But they have knives on the ship; they have little pocket knives, but I know that switchblade knives and sheave knives, they don't allow."

\* \* \* \* \* \*

"Q. Are they informed at that time that they are not supposed to carry dangerous weapons, or take dangerous weapons board? A. Well, I don't know if anybody was informed; everybody knows that. You never see those type knives on a ship; I never have. \* \* \*"

■ At the trial the plaintiff's counsel saw the chief mate in the courtroom and called him as a witness. The mate testified:

"Q. Are switchblade knives allowed aboard vessels?

chiefs, almost without exception, indicate that these vicious weapons are on many occasions the instrument used by juveniles in the commission of robberies and assaults. Of the robberies committed in 1956, 43.2 per cent were by persons under 21 years of age. A switchblade knife is frequently part of the perpetrator's equipment in this type of crime. In New York City alone in 1956, there was an increase of 92.1 percent of those under 16 arrested for the possession of dangerous

weapons, one of the most common of which is the switchblade knife."
The report points out that:
"As a result of this study, a bill (S. 2558) to prohibit the manufacture for, or distribution in, interstate commerce of switchblade knives was introduced by Senator Kefauver and referred to your committee. The present measure, which was passed by the House of Representatives on June 27, 1958, is similar to the Senate bill but, unlike the latter, is not aimed specifically at sales to juveniles."

"The Court: By whom?

"By Mr. Roth:

"Q. Switchblade knives in the possession of crewmen, are they allowed aboard vessels? A. Yes, I think they are."

Taken by surprise, counsel proffered the deposition to impeach the witness. The court did not permit the use of the deposition. The court held that the chief mate was the plaintiff's witness and that the testimony indicated a slight variance, but no hostility. We consider that the chief mate, who is in charge of the ship in the absence of the master, and was in fact in charge at the time of the fight, is in a managerial capacity and is so identified with the interests of the shipowner, as against the interests of a seaman, that he should be treated as a managing agent under F.R.Civ.P. rule 43(b), 28 U.S.C.A. See June T., Inc. v. King, 1961, 5 Cir., 290 F.2d 404, 406. The plaintiff should not be bound by the chief mate's testimony and the mate should be subject to cross-examination. Here, his testimony—assuming that he was right the first time when he gave his deposition in the office of the defendant's counsel—shows that the practice in the merchant marine *is* to consider switchblade knives as dangerous weapons and not allow them aboard ship. His deposition underscores the obvious fact that a switchblade knife is regarded as lethal aboard ship as it is in the back alleys of gang-infested urban areas.

Summarizing, we hold that the district court erred in not submitting to the jury the question whether a switchblade knife is a dangerous weapon within the meaning of 18 U.S.C.A. § 2277. It is also for the jury to decide, under appropriate instructions, if the shipowner, through his officers, agents, or employees, knew or should have known that Murphy had a switchblade knife on the Esso Augusta and whether the shipowner failed to take prudent action to protect the crew. We are also of the opinion, without belaboring the point, that the record does not support a finding that the victim was negligent, and that the question of Fall's negligence should not have been submitted to the jury. Fall could not have foreseen the vicious attack Murphy made upon him with a dangerous weapon.

We feel compelled to hold that the general maritime law, unaided by the Jones Act, anomalously, archaically, unnecessarily in terms of general principles, gives Fall's widow and administratrix no right of action. We observe that if, on retrial, the evidence permits a finding of a negligent failure to comply with the absolute duty to furnish a seaworthy vessel, the Jones Act provisions apply to an injury resulting from such unseaworthiness. Cortes v. Baltimore Insular Line, 1932, 287 U.S. 367, 53 S.Ct. 173. 77 L.Ed. 368; Michalic v. Cleveland Tankers, 1960, 364 U.S. 325, 81 S.Ct. 6, 5 L.Ed.2d 20; Vickers d/b/a Delta Towing Company v. Tumey, 5 Cir., 1961, 290 F.2d 426. There is no reason why the survival provisions of the Act should not apply to a death resulting from such injury. We find it unnecessary at this time to determine other issues, including the question whether the Jones Act permits a death action based on non-negligent unseaworthiness.[7] We

---

7. See Lindgren v. United States, 1930, 281 U.S. 38, 50 S.Ct. 207, 74 L.Ed. 686; Holland v. Steag, Inc., D.C.Mass., 1956, 143 F.Supp. 311; Bath v. Sargent Line Corp., S.D.N.Y., 1958, 166 F.Supp. 311. Cf. Comment on Lindgren in Kernan v. American Dredging Co., 1958, 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382; The M/V Tungus v. Skovgaard, 1959, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524; Gill v. United States, 2 Cir., 1950, 184 F.2d 49, 51. See also, the concurring opinion of Judge Lumbard in Barthol-

omew v. Universe Tankships, Inc., 2 Cir., 1959, 263 F.2d 437, 448; Turcich v. Liberty Corp., 3 Cir., 1954, 217 F.2d 495.

The continuous expansion of basic principles in the rapidly developing field of maritime injuries suggests the desirability of the trial court giving consideration to the submission of the case to the jury by special interrogatories under F.R.Civ.P. rule 49. Such interrogatories might well encompass the issues of negligence, negligent unseaworthiness, and non-negligent unseaworthiness. In this

**418**

leave this issue open without prejudice to the plaintiff.

The judgment is reversed and the case remanded for proceedings consistent with this opinion.

way the trial court, and later, if necessary, this court on review, will have precise fact findings on which to apply the applicable law. See, e. g., Vickers v. Tumey, 5 Cir., 1961, 290 F.2d 426, 1961 A.M.C. 1173, notes 4 and 9; Warren Petroleum Company v. Thomasson, 5 Cir., 1959, 268 F.2d 5, 9, note 3; Clegg v. Hardware Mutual Casualty Co., 5 Cir., 1959, 264 F.2d 152; Travelers Ins. Co. v. Busy Electric, 5 Cir., 1961, 294 F.2d 139, 149.