**COMPANIA ANONIMA VENEZOLANA DE NAVEGACION (Venezuelan Line), Appellant,**

v.

**A. J. PEREZ EXPORT COMPANY, etc., and Tyler Refrigeration Corporation, Appellees.**

**No. 19117.**

United States Court of Appeals Fifth Circuit.

May 30, 1962.

Rehearing Denied July 17, 1962.

———◆———

James J. Morrison, Gloria Irvine, New Orleans, La., for appellant.

Raymond H. Kierr, Samuel C. Gainsburgh, Kierr & Gainsburgh, New Orleans, La., for appellees.

Before RIVES, BROWN, and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

While the case ostensibly presents the question whether a common carrier by water may ever estop itself by inequitable conduct from exacting the full measure of the shipper's obligation to pay tariff charges, the true nature shows it to be something quite different. What it really is, is a contest of equities, not between the carrier and a shipper, but between a subrogee of a carrier and that shipper. Without quite putting the case in these terms, the trial Court in two consolidated admiralty libels held in favor of the Shipper. Doing so, the Court denied recovery of freight charges claimed in the name of the Carrier, but actually sought by a berth agent (in the Carrier's name) to reimburse itself for freight uncollected from a Freight Forwarder and made good to the Carrier pursuant to the credit guarantee in the agency agreement. We affirm.

██ If there ever were a case in which fact findings of the trial Judge should be accorded the great respect required by the clearly erroneous concept of the Civil Rules, now incrusted on the hull of maritime jurisprudence, O/Y Finlayson-Forssa A/B v. Pan Atlantic S. S. Corp., 5 Cir., 1958, 259 F.2d 11, 13, 1958 A.M.C. 2070; Myles v. Quinn Menhaden Fisheries, Inc., 5 Cir., 1962, 302 F.2d 146, this it is. A reading of this record is convincing that impressions were annealed, and irrevocably so, "through the hammering, heating process of vigorous, running advocacy" [1] in which the star witness for the Carrier was pretty generally discredited as he continued his testimony over the course of a year and a half.[2] Consequently, we accept all credibility choices. We reject none of them. Our differences, such as they are, concern the legal significance of facts.

At the outset, this is not the case of the Shipper [3] not making a payment of the full amount of tariff freight charges. It is therefore not one in which anyone wants, or gets, a free ride. The trouble came from the fact that all of the ocean freight charges sought here [4] were paid in advance by the Shipper to the Freight Forwarder [5] acting for the Shipper. The

---

1. Ohio Barge Line, Inc. v. Oil Transport Co., 5 Cir., 1960, 280 F.2d 448, 449, 1961 A.M.C. 375; and Bisso v. Waterways Transportation Co., 5 Cir., 1956, 235 F. 2d 741, 743, 1956 A.M.C. 1760.

2. The trial began and was adjourned on November 6, 1958, with this witness then under examination as an adverse witness. See Davis v. Parkhill-Goodloe Co., Inc., 5 Cir., 1962, 302 F.2d 489; June T., Inc. v. King, 5 Cir., 1961, 290 F.2d 404, 406, n. 1, 1961 A.M.C. 1431; Fall v. Esso Standard Oil Co., 5 Cir., 1961, 297 F.2d 411, 417. Nineteen months later he was the lead-off as the trial resumed June 7, 1960.

3. There were actually two Shippers, A. J. Perez Export Company and Tyler Refrigeration Corporation. The cargo being moved was refrigerators from Niles, Michigan to Venezuela. Except where specifically mentioned, no significant difference exists and both are referred to merely as Shipper.

4. *Shipped by Perez*

| B/L | Date | Freight Charges |
|---|---|---|
| 18 | June 11, 1954 | $1,506.52 |
| 16 | June 23, 1954 | 1,577.15 |
| 6 | July 2, 1954 | 1,011.70 |
| 4 | August 6, 1954 | 822.19 |
| 40 | November 26, 1954 | 2,961.09 |

*Shipped by Tyler*

| | | |
|---|---|---|
| 7 | July 9, 1954 | 1,521.04 |
| 27 | July 30, 1954 | 2,322.51 |
| 29 | August 6, 1954 | 764.33 |

5. Alonzo Shipping Company, Inc., engaged in the business of a Freight Forwarder in New Orleans.

Freight Forwarder did not, however, remit the funds to the local Agent [6] of the Carrier [7] as it had bound itself to do both as agent of the Shipper and also pursuant to so-called "Due Bills" under which possession of the original signed bills of lading was released by the Carrier to the Freight Forwarder against the Forwarder's promise to pay freight charges within three days (or return the ladings). This credit had been extended, not by the Carrier, but by the Agent. The Carrier was not altogether blameless, for despite its tariff and bill of lading provisions requiring payment for freight without credit, it had taken the precaution of subjecting the Agent to an express guarantee.[8]

For many months the Agent treated this as a liability of the Freight Forwarder alone. The Agent did not even advise the Shipper of nonpayment of freight un-

til the very eve of its own payment to the Carrier under its credit guarantee (note 8, supra). By that time, the Freight Forwarder was defunct, at least financially so. In remitting the full amount of the freight charges to the Carrier under its guarantee, the Agent made no reservation of rights. It was not until a month later that the Agent, through correspondence with the Carrier, attemped to give this remittance the character of an "advance" rather than a payment.[9] Even then the Agent was reiterating that the debt was due it by the Freight Forwarder.[10]

■■ Of course it makes a lot of difference whether this is really a suit by the Carrier. If it is a suit by the Carrier, we can assume that by virtue of its filed tariffs expressly incorporating its bill of lading contract, conduct by the Carrier—no matter how inequitable—

6. Isbrandtsen (New Orleans), Inc., the wholly owned Louisiana subsidiary of Isbrandtsen Company, Inc., was engaged in the business of steamship agent in New Orleans. Under formal contract it had been appointed by the Carrier "as its Agent in the Gulf Ports, Baltimore and Philadelphia, for the servicing of any and all vessels owned, operated and/or managed or otherwise controlled by" the Carrier.

As compensation for these services the Agent was to receive commission on outward cargo ranging from 5% to 2½%.

7. Compania Anonima Venezolana De Navegacion, a corporate agency of the Venezuelan Government.

8. The Agency Agreement provided:
"It is agreed that any and all due bills that Isbrandtsen may issue for freight and charges in connection with any cargo shipped from any of the ports at which it serves * * * as Agent, will be the exclusive responsibility of Isbrandtsen * * *."

9. The check in the amount of $12,486.53 payable to the Carrier was sent by the Agent on May 24, 1955. On June 24, 1955, a letter from the Agent to the Carrier stated: "You also are aware that it has regretably been necessary for us to take legal action to collect the freights listed from the Shippers and/or [Freight Forwarder]. To do this, since they were on Venezuelan Line B/Ls, it was necessary to enter the legal action in the name of the Venezuelan Line.

"Will you, for the record and for certain technicalities which our lawyer sees arising, confirm that the check was sent you covers these items and that in the event you receive such a check or checks dealing with these B/Ls that it will be turned over to us since the money will be a replacement to us of the funds we paid you in carrying out our contract with you as per clause therein."

The record is a complete blank concerning agreement to, or acquiescence in, these statements by the Carrier.

10. On June 10, 1955, the Agent filed a suit in the Louisiana State Court against the Freight Forwarder for the exact amount of the freight (see note 4, supra). This verified petition, after describing the custom and issuance of due bills for these specific shipments and the release of ocean bills of lading under them, alleged that "the bills of lading * * * in the * * * due bills constituted collateral security * * * for the payment of the freights * * *; that the freight monies represented thereby were loaned by [Agent] on the collateral security of such bills of lading * * *; that [Agent] is in the business of loaning money on such collateral security; that [the Freight Forwarder has] failed * * to return such collateral security * * or to make [Agent] a cash payment * * *."

On the very same day the libel was filed against Tyler; the one against Perez was filed on June 4, 1955.

cannot excuse it from enforcing collection of freight, nor can harm innocently suffered by the Shipper—occasioned by the wrongdoing of another (the Agent)—excuse it from paying the Carrier even though this means payment twice. That would follow from the rigorous policy which, to prohibit not only discrimination but the possibility of it,[11] gives to carrier tariffs the force of law.[12]

The force of the District Court's findings, and for that matter the uncontradicted evidence, shows that the one seeking recovery is not the Carrier. The libel, to be sure, is brought in its name, but the real party in interest is the Agent. Both under accepted admiralty practice and that required under F.R. Civ.P. 17(a), 28 U.S.C.A., the libellant ought to have been the Agent as the real party in interest. 2 Benedict, Admiralty §§ 230, 245, at 43, 82–85; Czaplicki v. S. S. Hoegh Silvercloud, 1956, 351 U.S. 525, 529, 76 S.Ct. 946, 100 L.Ed. 1387, 1956 A.M.C. 1465; United States v. Aetna Casualty and Surety Co., 1949, 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171. But the inquiry does not end here. With all of its vaunted flexibility, admiralty would certainly provide some method by which the one paying (the Agent)—and hence the real party in interest—could have a judicial determination of the liability of the other (the Shipper) to him. The trial Court was correct therefore in concluding that the Agent, who paid the entire amount due to the Carrier, as a sort of guarantor, indemnitor or quasi-surety, had the right to *seek* subrogation to the rights of the Carrier (as creditor) against the Shipper (as debtor or principal).

But to *seek* subrogation and to attain it are two quite different things. Once subrogation is recognized, it carries with it all of the rights which the subrogor had. 50 Am.Jur. Subrogation, §§ 110–112. That would include the extraordinary preferred status of a carrier asserting contractual "statutory" tariff rights (see note 12, supra). But it is the investiture of the subrogee with such sweeping vicarious rights which is itself a factor in determining whether subrogation is to be allowed.

---

11. This policy has found expression by Congress in every statute regulating commerce since the early enactment of the Interstate Commerce Act. This includes the Shipping Act of 1916 and all of its amendments, 46 U.S.C.A. §§ 812, 814–817, the Transportation Act, 49 U.S.C.A. § 6 (7), 49 U.S.C.A. § 906(c), and the Civil Aeronautics Act, 49 U.S.C.A. § 483(b).

12. We have phrased it in many ways. Collection and payment of the charge for transportation "is not a mere matter of contract. For 'a rate once regularly published is no longer merely the rate imposed by the carrier, but becomes the rate imposed by law.' * * * As a natural corollary to such a dynamic policy prohibiting the possibility or temptation to preferential discrimination * * * is the equally uncontradicted legal proposition that estoppel cannot be invoked against a common carrier to avoid a tariff provision. 'Neither the intentional nor the accidental misstatement of the applicable published rate will bind the carrier or shipper * * *.' It is clear that no 'act or omission of the carrier' can 'estop or preclude it from enforcing payment of the full amount' of the tariff charges * * *. And 'equitable considerations may not serve to justify failure of carrier to collect, or retention by shipper of, any part of lawful tariff charges.'" United States v. Associated Air Transport, Inc., 5 Cir., 1960, 275 F.2d 827, 833.

River Terminals Corp v. Southwestern Sugar & Molasses Co., 5 Cir., 1958, 253 F.2d 922, 1958 A.M.C. 1534, aff'd 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334, and on remand 5 Cir., 1960, 274 F.2d 36, 1960 A.M.C. 2064.

In doing so, we simply echo imperative decisions. Crancer v. Lowden, 1942, 315 U.S. 631, 62 S.Ct. 763, 86 L.Ed. 1077 ("* * * * tariffs bind both carriers and shippers with the force of law"); Atchison, T. & S. F. Ry. Co. v. City of Chicago, 7 Cir., 240 F.2d 930, aff'd, 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 ("A tariff under provision * * * requiring every common carrier to file * * * is to be treated the same as a statute."); and see also United States v. Kansas City So. Ry. Co., W.D.Mo., 1953, 116 F.Supp. 484.

Empire Petroleum Co. v. Sinclair Pipe-line Co., 10 Cir., 1960, 282 F.2d 913, is a vivid application of these principles.

This takes us to the very fundamentals of subrogation. It is now a mechanism so universally applied in new and unknown circumstances that it is easy to overlook that it originates in equity. Every facet, whether substantive or procedural, is controlled by the equitable origin and aim of subrogation. These principles, so well established that to cite cases would be an affectation, find expression in accepted texts, as the following excerpts reflect. "Legal subrogation is a creature of equity not depending upon contract, but upon the equities of the parties." 50 Am.Jur. Subrogation § 3 at 679. Through it equity seeks " * * * to prevent the unearned enrichment of one party at the expense of another * * *." § 4 at 681. It has "for its purpose the working out of an equitable adjustment and the doing of complete and perfect justice between the parties by securing the ultimate discharge of a debt by the person who in equity and good conscience ought to pay it, and preventing the sweeping away of the fund from which in good conscience the creditor ought to be paid." § 6 at 683–84. It has been "characterized as an eminently just doctrine, a pure, unmixed equity, one of the benevolences of the law, created, fostered, and enforced in the interest and for the promotion of equity and justice, and to prevent injustice." § 6 at 685. Applied as it now is, "it is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter." § 7 at 686. It is "a consequence which equity attaches to certain conditions. It is not an absolute right, but one which depends upon the equities and attending facts and circumstances of each case." § 10 at 688. Because its object is "to do complete and perfect justice between the parties without regard to form or technicality, the remedy will be applied in all cases where demanded by the dictates of equity, good conscience, and public policy. Consequently, relief by way of subrogation will not be granted where it would work injustice, or where innocent persons would suffer, or where the result would be inimical to a sound public policy." § 11 at 690. As "subrogation is administered upon equitable principles, it is only where an applicant has an equity to invoke that the courts will interfere. Moreover, the equity of the party seeking subrogation must be strong and his rights clear, and his equity must be superior to that of other claiments." § 12 at 690–91. And it "will not be enforced to the prejudice of other rights of equal or higher rank, or to displace an intervening right or title, or to overthrow the equity of another person." § 13 at 691–92. Subrogation "is not an absolute right which a party paying the debt of another may enforce at will, but rather, a matter of grace to be granted or withheld as the equities of the case may demand." § 16 at 693. The whole aim of subrogation "is the doing of equity and justice, and the relief will not be decreed where it will work an injustice, and so it cannot be invoked to the injury of innocent third persons." § 17 at 693.

In view of these equitable principles it is important to consider just what this case is. On the one hand is the Agent who is in the business of lending credit[13] to a party unworthy of the trust (the Freight Forwarder). On the other hand, is the innocent Shipper who paid the full amount of the charges to such defaulting party for remittance to the Agent.

Certainly on the facts found and necessarily implied, the Shipper must be considered innocent. The only mistake the Shipper made was to trust the Freight Forwarder. Otherwise its conduct was irreproachable. The Shipper knew it was required to prepay the freight charges. It divested itself of funds for all such freight charges. It chose a means—use of a freight forwarder—and of that group it selected one presumably considered by the ship-

---

13. See note 10, supra.

ping fraternity as reputable and competent. It followed the usual custom and practice of remitting ocean freight through that party, the Freight Forwarder. The business trustworthiness of that Freight Forwarder cannot now be questioned either by the Carrier or the Agent since the Agent considered it worthy of credit and entrusted to it the valuable shipping documents (bills of lading) against a mere promise to return them, or pay, or both.

There is nothing in this record to charge the Shipper with knowledge that credit would be extended by the Agent (or the Carrier) to the Freight Forwarder to whom it had already furnished funds for the payment in cash of these charges. Nothing the Shipper did indicated that it either expected, or desired, the extension of credit. But it was this unknown extension of credit by the Agent to the Freight Forwarder that brought on the whole brief. Until that occurred, there was no risk to anyone. The Carrier thought the Agent retained the signed ocean bills of lading. The bills of lading would not be released until freight was paid. Funds for the payment of that freight had been put in the Freight Forwarder's hands. Hence, even if it is assumed that the Shipper mistrusted the Freight Forwarder, that misplaced faith caused no loss. The loss was occasioned wholly and solely by the voluntary act of the Agent in gratuitously extending credit to the Freight Forwarder and releasing bills of lading contrary to the provisions of the Carrier's tariff, the bills of lading themselves, and, more important, the imperative demands of the law.

It is harsh enough when, *vis-a-vis* Carrier and Shipper, it is the *law* that commands a shipper to pay twice if the carrier has not in fact received the money. It is shocking to say that *equity* would compel it. In the contest of relative equities, he who now seeks the Chancellor's grace has set the whole train of misfortune in motion. No longer having the "legal" standing of a carrier whose peremptory mace might compel a court of law to grant relief, the real libellant has

naught but the gentle "wand of equity," United States v. Maryland Casualty Co., 5 Cir., 1956, 235 F.2d 50, 53, 1956 A.M.C. 1822.

These factors attain only added vitality when consideration is given to other conduct of the Agent. Under the due bills the Freight Forwarder promised to pay the freight or return the bills of lading within three days. Thus, within four days of the release of the bills of lading, the Agent knew that the Freight Forwarder was not honoring its promise to pay or return. Nothing, absolutely nothing, was done by the Agent except some unidentifiable weak-kneed requests made of the Freight Forwarder to do as it had promised. Not a word was breathed to the Shipper until May 9, 1955—more than five months after the one recent shipment in November 1954 and practically ten months as to all others (see note 4, supra). The explanation for this action— which the trial Judge characterized as incredible—was not hard to find. The Agent did not really try very hard, nor, by the nature of things, could he either press too strongly for payment by the Freight Forwarder, or take the extraordinary step of notifying the Shipper that the Freight Forwarder had defaulted on his trust. This was because competitive forces in the shipping business are so severe in the solicitation and booking of outbound export traffic, that the Agent, dependent upon its generated traffic for its compensation (see note 6, supra) did not wish to incur the ill will of the Freight Forwarder as a source of added business from other shippers in the future. And where excessive pressure on the Freight Forwarder to pay its obligations might be thought untactful, it was completely out of the question, so the Agent made clear, for it to embarrass this potential source of future business by exposing his infidelity, incompetence, or down right dishonesty to the principal (the Shipper). To collect the freight from the Freight Forwarder was important. But one cannot read this record without the uncomfortable conviction that what was more important was preserving

the good will of the Freight Forwarder lest traffic suffer tomorrow.[14]

The record is therefore uncontradicted that, with full knowledge that the Freight Forwarder had defaulted, and with complete indifference to whether the Shipper had, or had not, put the Freight Forwarder in funds, the Agent did nothing to advise the Shipper of this state of affairs.[15] In the meantime, the freight had been shipped and delivered.[16] The Shipper was given no chance, until it was too late, to do anything to salvage the loss which the Agent's traffic-hungry policies had created. That is laches, in its plainest form. As such it bars equitable relief by one claiming an equitable status even though, as between Carrier and Shipper, limitations may not have run.

The Chancellor is no longer fixed to the woolsack. He may stride the quarter-deck of maritime jurisprudence [17] and,

in the role of admiralty judge, dispense, as would his landlocked brother, that which equity and good conscience impels. Hadjipateras v. Pacifica, S. A., 5 Cir., 1961, 290 F.2d 697, 1961 A.M.C. 1417; Swift & Co. Packers v. Compania Colombiana Del Caribe, S. A., 1950, 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206, 1950 A.M.C. 1089; Kossick v. United Fruit Co., 1961, 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56, 1961 A.M.C. 833.

Whatever equity the Agent could muster in its own behalf was not enough to tip the scales. The Court, with ample basis, thought that as between the two, the equities were overwhelmingly in favor of the Shipper, and to grant what the Agent sought would produce, not equity, but inequity. Subrogation as an equitable weapon may not thus be corrupted.

Affirmed

---

14. The trial Court had before it the extensive report of the Examiner in Docket No. 765 and 831 of the "Investigation of Practices, Operations, Actions, and Agreements of Ocean Freight Forwarders and Related Matters and Proposed Revision of General Order 72" which sets forth in such detail the abuses thought to result from freight brokers having such a competitive death grip on generated traffic with a resulting practical inability of ocean carriers to do anything which might incur the ill will of freight forwarders. This led to what Congress later described as "the crushing provision of the Board's revised General Order No. 72" requiring that forwarders "must look to the shippers, rather than to the carriers, for payment for their work." Congress rejected this by the passage of the independent ocean freight forwarders licensing amendment to the Shipping Act of 1916. Public Law 87–254; 75 Stat. 522, 46 U.S.C.A. §§ 801, 841b; 1 U.S.Code Congressional and Administrative News 1961, at 591. The Legislative History of the Act is at 2 U.S.Code Congressional and Administrative News 1961 at 2699 (S. R. 691, August 9, 1961, and H.R. 1096, August 21, 1961). See the subsequent decision of the Federal Maritime Commis-

sion in No. 831, January 23, 1962, 30 L.W. 2371.

15. Actually as to the Tyler shipments, it was not mere silence. It was active concealment. In October-November 1954 it was discovered that several shipments presumably shipped months before were still on the dock in New Orleans because the Freight Forwarder had misused funds previously sent to it by Tyler. A procedure was then set up for Tyler to send payments direct to the Agent as to future shipments. But not a word was said about the Freight Forwarder's default as to the frieght due on the three July-August shipments (see note 4, supra).

16. This makes wholly irrelevant the collateral controversy as to whether the original signed bills of lading released to the Freight Forwarder under due bills bore the stamped, printed clause "freight to be prepaid" or "freight prepaid." The Carrier, by transporting and delivering the goods, obviously treated them as freight paid.

17. Cf. United Geophysical Co. v. Vela, 5 Cir., 1956, 231 F.2d 816, 819, 1956 A.M.C. 745.