**LYKES BROS. STEAMSHIP CO., INC., Plaintiff,**

v.

**AMERICAN CAST IRON PIPE COMPANY, Harwell & Cary, Inc., and Kristin Shipping Company, Defendants.**

**Civ. A. No. 85–1333–T.**

United States District Court, S.D. Alabama, S.D.

June 4, 1987.

---

Joseph M. Allen, Jr., Gregory C. Buffalow, Johnstone, Adams, Bailey, Gordon & Harris, Mobile, Ala., for plaintiff.

Erling Riis, Jr., J. Burruss Riis, Vickers, Riis, Murray & Curran, Mobile, Ala., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DANIEL HOLCOMBE THOMAS, Senior District Judge.

I find no fault with the Findings of Fact proposed by the defendant and filed on May 1, 1987, through Paragraph 18. I think some additions are necessary which I add beginning with paragraph 19.

### FINDINGS OF FACT

#### Jurisdiction

1. This is an action in admiralty and a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Jurisdiction is conferred upon this court by the provisions of 28 U.S.C. § 1333.

#### The Claim

2. The claim of plaintiff, *Lykes Bros. Steamship Co., Inc., (Lykes)* is for freight charges based on three shipments by American Cast Iron Pipe Company (ACIP-CO) to Egypt, as evidenced by three invoices, each issued by Southern Steamship Agency, Inc. (Southern Steamship), as Agent for Lykes. The invoice dated June 26, 1984, is to Kristin Shipping Co. (Kristin) in the amount of $400,000.00. The invoice dated December 5, 1984, is to ACIPCO in the amount of $34,582.32. The invoice dated December 26, 1984, is to ACIPCO in the amount of $56,933.10. The total of these three invoices amounts to the sum of $491,-515.42. Plaintiff, Lykes, alleges in its complaint that the total amount of the indebtedness remaining due is $135,095.12, and this amount is claimed separately and severally against ACIPCO, Kristin, and Harwell & Cary, Inc. (Harwell & Cary).

3. Defendant, Harwell & Cary, suffered a summary judgment by default for the sum of $131,197.56.

#### The Defense

4. The defense of ACIPCO and Kristin is:

(a) that this indebtedness has been paid in full in that they have paid the total amount of these invoices to Harwell & Cary and have therefore met their obligation and hence are under no duty or obligation to pay twice;

(b) that the claim under invoice dated June 26, 1984, for $400,000.00 is barred by laches in that these defendants paid Harwell & Cary the said $400,000.00 on July 7, 1984, and the first notice ACIPCO or Kristin received that the said $400,-000.00 had not been paid to plaintiff Lykes by Harwell & Cary was January 11, 1985, six months after these defendants paid same;

(c) that plaintiff Lykes is estopped from pursuing its claim against ACIPCO on the two December invoices because plaintiff Lykes continued to deliver its invoices and bills of lading to defendant Harwell & Cary after Lykes knew or should have known that:

(i) Harwell & Cary had not paid Lykes the $400,000.00 June invoice; and

(ii) ACIPCO would pay Harwell & Cary the sum of $91,755.10 in payment of these two December shipments.

*Facts*

5. In the early part of 1983, ACIPCO was awarded a contract with the National Organization for Potable Water (NOPWASD) going to Alexandria, Egypt, and it was negotiating for a contract for shipment to the Suez Canal Authority in Port Said Egypt. Both of these projects were under a program of the United States known as Assistance for International Development (AID), which required, among other things, that the cargo be transported with U.S. Flag shipping companies. The orders were for ductile iron pipe and accessories.

6. Walter M. Boyce (Boyce), Director of Traffic and Transportation for ACIPCO, and Vice President–Operations for Kristin, proceeded to make inquiry and obtained quotations from various U.S. Flag shipping companies, including Plaintiff Lykes, and he also made inquiries to ship owners and conducted studies on charter costs for moving ship loads. Kristin is authorized and insured to charter vessels and acts in every way as a carrier. It was ultimately determined that the most economical way to ship the goods would be for Kristin to charter Seabee barges from Lykes for transport to Egypt on a Lykes barge ship. In addition to the cost factor, the cargo to be shipped needed to be stored in wide square hatches with no 'tween decks. The Seabee barges provided the safest and best method of shipment. The Seabee barge, when its covers are removed, has straight vertical sides and virtually no deck overhang at the top. Pipe can be lowered straight into the barge without impacting it into the bulkheads of other pipes.

7. In November of 1983, an agreement in principle for all NOPWASK Egyptian shipments to Alexandria was reached between Stewart LeBlanc on behalf of Lykes, and Walter Boyce on behalf of Kristin, but there was no written confirmation of the agreement. The agreement was for free in-liner out terms which gave Kristin the right and responsibility to load the cargo in the barges. The barges would then be loaded on a Barge Ship or Mother Ship. The initial communication and negotiations regarding this overall shipping arrangement was handled by Boyce. The formalities of each individual shipment were arranged by the freight forwarder, Mr. Harwell, with Gulf States Forwarding, Inc. (Gulf States) and Harwell & Cary.

8. On November 21, 1983, a final agreement was reached for the first shipment and on December 14, 1983, Boyce sent a telex to LeBlanc of Lykes confirming the terms of this first shipment which provides substantially as follows: Kristin contracted with Lykes for 100% of space on ten Seabee Barges to be loaded by Kristin in Mobile, Alabama. These ten barges were to be loaded by Lykes on the "SS Almeria Lykes", the Mother Ship, on or about December 15, 1983, in either Mobile or New Orleans. The "SS Almeria Lykes" would proceed immediately to Alexandria, Egypt, where all material would be discharged to trucks at end of hook. Kristin would pay all costs of loading, lasing and securing the ten Seabee Barges at Mobile, Alabama, and all other expenses normally included in free in-liner out terms including, but not limited to port charges, Alexandria stevedoring, and agency fees, would be borne by Lykes. Kristin would pay Lykes $100,000.00 per barge for space as described above.

9. This first shipment to Alexandria, Egypt, moved on the "SS Almeria Lykes" under bill of lading dated December 10, 1983. Gulf States acted as freight forwarder for this shipment. The use of a freight forwarder was the usual custom in industry and between Lykes and ACIPCO for more than 20 years. Southern Steamship, as agent for Plaintiff Lykes, issued an invoice to ACIPCO in the sum of $1,000,000.00 for this freight and delivered the invoice to freight forwarder, Gulf States. The freight forwarder rendered its invoice to Kristin for this shipment for $1,000,000.00 and payment was made by Kristin to Gulf States by check dated December 21, 1983. Gulf States subsequently

paid Lykes after deducting its forwarding commission of 2½%.

10. A second shipment to Alexandria, Egypt, moved on the "SS Almeria Lykes" under bill of lading dated January 23, 1984. Specific arrangements for this shipment were handled by the freight forwarder, Gulf States. An invoice for affreightment in this shipment was, once again, in accordance with usual procedure, sent by Southern Steamship to the freight forwarder, Gulf States. An invoice dated February 20, 1984, was prepared by Gulf States in the amount of $650,000.00, and was then submitted by the forwarder to Kristin for payment. This invoice was paid by Kristin to Gulf States by a check dated March 2, 1984, in the amount of $650,000.00. Gulf States then paid plaintiff by check in the sum of $633,750.00. This represents the $650,000.00 less 2½ brokerage, i.e., $16,-250.00.

11. The invoice for the third shipment was delivered directly to Kristin by Southern Steamship. This had broken the procedure that had been followed in the two previous shipments, i.e., delivery invoice to the freight forwarder who, in turn, invoiced Kristin and received payment from Kristin. Kristin received a letter from Southern Steamship enclosing its invoice dated April 4, 1984, which was for a shipment on the "SS Almeria Lykes" in the amount of $1,050,000.00 and contained a typed notation:

PLEASE REMIT TO:
SOUTHERN STEAMSHIP AGENCY, INC.
P.O. Box 2188
MOBILE, ALABAMA 36652

The letter accompanying this invoice contained *special* instructions requesting payment *directly* to Southern Steamship as opposed to paying through the freight forwarder as usual. Boyce telephoned Mr. Tom Killeen of Lykes in New Orleans and questioned the manner of this billing and the payment directions contained in the invoice. Killeen requested Kristin to pay the invoice directly to Southern Steamship, which Kristin did.

12. The fourth shipment to Egypt was in the Spring of 1984. This is the first shipment involved in this litigation. ACIPCO had received a confirmation of the Suez Canal Authority Job (as opposed to the NOPWASD job which involved all previous shipments) and entered into a verbal agreement with Lykes on, to-wit, April 12, 1984, for Kristin to charter four Seabee Barges for shipment to the Suez Canal Authority, Port Said, Egypt, for loading by Kristin in Port Osborne, Alabama, or Mobile, Alabama. There was a delay in the delivery of the barges but finally all barges were loaded under the supervision of Harwell & Cary, Inc. acting as freight forwarder. Lykes had returned to its usual and customary procedure in that the original bill of lading dated June 18, 1984, and the invoice was delivered by Southern Steamship to the freight forwarder, Harwell & Cary. On June 28th, Kristin received an invoice from Harwell & Cary dated June 27, 1984, reflecting shipment to Port Said on the "SS Almeria Lykes" regarding the six bills of lading on this shipment for the total amount of $400,000.00. On July 7, 1984, Kristin sent a check for $400,000.00 to Harwell & Cary in payment of that invoice.

13. Kristin had been informed that the Seabee barges would sail on the "SS Almeria Lykes" in late June. After delays in shipment, on July 19, 12 days after making payment in full, Kristin was informed that the "SS Almeria Lykes" had been placed in European service and there would be no more Seabee service to Egypt. Lykes advised the freight forwarder that it would have to transfer the cargo from the Seabee barges into the SS Zoella Lykes, a conventional vessel not a Seabee barge ship, at New Orleans. The bills of lading terms made provision for substituting carrying vessels. No new bills of lading for the SS Zoella Lykes were issued. Lykes simply struck out "Almeria Lykes" and inserted "Zoella Lykes" on copies of the Almeria Lykes' bills of lading, and changed on the port of loading from Port Osborne or Mobile to New Orleans. Kristin never received an invoice other than the Harwell & Cary invoice dated June 27, 1984, for this

shipment reflecting the SS Almeria Lykes as the mother ship.

14. ACIPCO still had to complete the Egyptian shipment under these projects. It was Boyce's understanding that Lykes had abandoned its Seabee service to Egypt and there was not sufficient cargo to justify chartering a vessel. For the fifth and sixth shipments to Egypt (the two last shipments in this litigation), Harwell & Cary negotiated with Lykes to transport this cargo on the SS Shirley Lykes and the SS Tillie Lykes, a barge mother ship. Harwell & Cary again performed freight forwarding services on both of these shipments. Mr. Holloway of Southern Steamship testified that prior to releasing the bill of lading and the invoice on each shipment, he contacted Mr. Ledet, the Credit Manager of Lykes in New Orleans, and procured a clearance of credit on the shipper, i.e., ACIPCO, and that such a credit clearance check was made prior to issuing the bills of lading to Harwell & Cary for each of the December shipments. Notwithstanding this credit clearance check, Southern Steamship, as agent for Lykes, again delivered invoices and bills of lading to Harwell & Cary for the SS Shirley Lykes and the SS Tillie Lykes' shipments. Harwell & Cary, in turn, submitted to ACIPCO its invoices, first dated 12–11–84 in the amount of $34,-692.68 for the shipment on the SS Shirley Lykes, and second dated 12–26–84 in the amount of $57,082.42 for the shipment on the SS Tillie Lykes. As has been the usual practice between these companies for many years, ACIPCO issued its check, dated January 4, 1985, payable to Harwell & Cary for the sum of $91,775.10 in payment of the invoice from Harwell & Cary for these shipments on the SS Shirley Lykes and the SS Tillie Lykes.

15. The first notification either ACIPCO or Kristin received from Lykes or anyone else that these accounts were in default on the books of Lykes was by telephone by Lykes to ACIPCO on January 11, 1985. This conversation was confirmed by a letter from Lykes to ACIPCO dated January 14, 1985. Harwell & Cary, on the other hand, had received prior telephone calls from Lykes regarding these overdue payments.

16. In 1968, ACIPCO executed a Conference Credit Agreement to the Gulf Associated Freight Conference.

The form of the Gulf Associated Freight Conference Credit Agreement was revised effective February 1, 1984. This revision was prior to the three shipments involved in plaintiff's claim. ACIPCO did not execute the Agreement as revised. Although Boyce could not produce a written cancellation of the Credit Agreement that was executed approximately 20 years earlier, Boyce testified that these shipments were not handled through the Conference and that he had not received any tariffs or communications from the Conference over the past ten years. ACIPCO's relationship with the Gulf Associated Freight Conference had been terminated prior to these shipments.

Kristin never executed a Conference Credit Agreement.

17. There is no evidence of tariffs on the shipments made on the sea barges chartered by Kristin. Tariffs were never presented to Kristin or ACIPCO and were not the basis of the contract reached between the defendants and Lykes.

18. When ACIPCO first received notice of this claim, none of the indebtedness evidenced by the invoices had been paid, i.e., $491,515.42. Suit was instituted in October of 1985. The evidence is clear that all the payments received by Lykes on the reduction of these indebtednesses were paid by Harwell & Cary. Harwell admitted that the indebtedness was due by Harwell & Cary.

19. In arranging for this ocean carriage Mr. Boyce of ACIPCO sought a freight quotation from, among others, the plaintiff, Lykes. Following negotiations which Mr. Boyce conducted directly with Lykes without the involvement of Harwell & Cary or any other freight forwarder, an agreement was reached whereby Lykes would carry to Egypt for ACIPCO the pipe in question. To assist in the shipment ACIPCO retained the service of two freight forwarders; first Gulf States Forwarding Corporation, and in

early 1984, Harwell & Cary, Inc. These organizations were retained by ACIPCO because of the association existing between Douglas Harwell, President of Harwell & Cary, and Mr. Boyce, ACIPCO's Director of Traffic and Transportation.

20. The Egyptian purchasers arranged to pay ACIPCO by establishing a letter of credit in ACIPCO's favor with a bank acceptable to ACIPCO. ACIPCO received payment by presenting to the bank sixty day drafts with clean onboard bills of lading attached. ACIPCO received these bills of lading from Harwell & Cary, its freight forwarder. Harwell & Cary received the bills of lading on behalf of ACIPCO or Kristin from Lykes' Mobile Agent, Southern Steamship Agency. Upon receipt of the bills of lading, Harwell & Cary acknowledged expressly on behalf of ACIPCO or Kristin the obligation to pay the freight and other charges shown on the bill within 15 days from date of bill. Harwell & Cary receipted for the bills of lading on an invoice or due bill which was prepared in Mobile by Lykes' agent, Southern Steamship Agency. Harwell & Cary received the bills of lading which contained the wording: "for and on behalf of Kristin Shipping Company" for "for and on behalf of American Cast Iron Pipe Company". Harwell & Cary then transmitted the bills of lading to ACIPCO who used them to receive payment under the terms of the letter of credit.

21. The contract of carriage was arranged by ACIPCO direct with Lykes. Under this contract, Lykes agreed to deliver the pipe to Egypt for the agreed figure. Lykes has done this. ACIPCO, not Lykes, selected Harwell & Cary. Lykes never extended credit to Harwell & Cary. Lykes has completed its end of the bargain and has not been paid. It is true that ACIPCO paid the money to Harwell & Cary, but Harwell & Cary did not pass it on to Lykes as they should have done. It is unfortunate that ACIPCO will have to make a double payment, but they were the ones that selected Harwell & Cary.

22. Lykes contends that this transaction is governed by and subject to a Conference credit agreement on file with the Federal Maritime Commission. I think this is correct, though I see no reason to reach this question. ACIPCO executed the Conference Agreement in 1968. This agreement was revised on February 1, 1984. This revision was prior to the three shipments involved in this case. ACIPCO did not execute the Agreement as revised, but they were unable to produce any written cancellation of the agreement.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction of this matter and the parties pursuant to 28 U.S. C. § 1333.

2. The plaintiff cites a number of cases which furnish guidance on the legal issues presented by this Motion for Partial Summary Judgment. These cases include *Compania Anonima Venezolana De Navegacion v. A.J. Perez Export Co.*, 303 F.2d 692 (5th Cir.1962); *Brown & Root, Inc. v. M/V PEISANDER*, 648 F.2d 415 (5th Cir.1981); *Strachan Shipping Co. v. Dresser Industries, Inc.*, 701 F.2d 483 (5th Cir.1983).

3. The *A.J. Perez* case dealt with facts quite similar to those presented in this case. In *Perez*, an ocean carrier carried a cargo on which freight was charged. The shipper remitted funds to the freight forwarder but the freight forwarder did not remit funds to the carrier's agent "as it has bound itself to do both as agent of the Shipper and also pursuant to the so-called 'Due Bills.'" (*A.J. Perez*, 303 F.2d at 695). The facts thus far parallel those in the case at bar; however, in *Perez*, the ocean carrier's agreement with its agent, to which the freight was to be remitted, required that the agent pay the freight in full to the carrier even though it had not received payment from the shipper or the shipper's freight forwarder. Judge Brown stated in that opinion, the freight charges were claimed in the name of the Carrier, but were "actually sought by a berth agent (in the Carrier's name) to reimburse itself for freight uncollected from a Freight Forwarder and made good to the Carrier pursuant to the credit guarantee in the agency

agreement." *Id* at 694. The Court held that the carrier was not the real party in interest and that suit, therefore, was "... a contest of equities, not between the carrier and a shipper but between a subrogee of a carrier and that shipper." *Id.* The trial court's judgment for the shipper was affirmed. The Fifth Circuit, however, made the following observation:

> Of course it makes a lot of difference whether this is really a suit by the Carrier. If it is a suit by the Carrier, we can assume that by virtue of its filed tariffs expressly incorporating its bill of lading contract, conduct by the Carrier—no matter how inequitable—cannot excuse it from enforcing collection of freight, nor can harm innocently suffered by the Shipper—occasioned by the wrongdoing of another (the Agent)—excuse it from paying the Carrier even though this means payment twice. That would follow from the rigorous policy which, to prohibit not only discrimination but the possibility of it, gives to the Carrier tariffs the force of law.

*Id.* at 695–696. Although the foregoing was not required for decision of the *Perez* case, this Court nonetheless finds it to be a correct statement of the law and holds that it should be applied to resolution of the dispute between the parties here.

4. The requirement that the carrier be paid in full at its regular tariff rate for goods carried in ocean commerce was set forth clearly in the *Perez* case (*Id.* at 696 n. 12) and in a subsequent Fifth Circuit case which is binding on this court, *Brown & Root, Inc. v. M/V PEISANDER*, 648 F.2d 415 (5th Cir.1981).

5. ACIPCO has cited the cases of *Compania Sud Americana De Vapores v. Atlantic Caribbean Shipping Co.*, 587 F.Supp. 410 (S.D.Fla.1984) and *Inversiones Navieras Imparca, C.A. v. Polysar International, S.A.*, 465 F.Supp. 102 (S.D.Fla. 1979). In both of these cases, the forwarder negotiated the contract of carriage with the ocean carrier. Of course, this is quite different from the facts in the instant case.

6. Lykes is also claiming pre-judgment interest. While I realize that in admiralty, absent unusual circumstances, pre-judgment interest is appropriate in most cases, based on the theory that the defendant had the use of the money to which plaintiff was entitled from the due date until judgment. That is not the situation here. ACIPCO in good faith paid the money to Harwell & Cary and though it was not passed on to Lykes by Harwell & Cary as it should have been, I think in equity pre-judgment interest should not be awarded under the facts in this case.

7. I do not believe this matter is barred by laches nor estoppel.

A Judgment will be forthwith entered in accordance with these Findings of Fact and Conclusions of Law.

### JUDGMENT

Pursuant to Findings of Fact and Conclusions of Law entered this date, it is ORDERED, ADJUDGED and DECREED that Judgment in the amount of $131,197.56, be entered in favor of the plaintiff, Lykes Bros. Steamship Co., Inc., and against the defendant, American Cast Iron Pipe Company, together with post-judgment interest at the rate of 7.02% per annum, from date of Judgment until paid.

There are other claims not yet decided in this litigation, Lykes, ACIPCO and Kristin against Intervenor Old Republic Insurance Company, which will be decided at a later date.