PHINEAS NORTH vs. RODNEY BRACE AND OTHERS.

Certain stockholders of a manufacturing corporation signed the following agreement : " Whereas the undersigned are members of the T. M. Co. and owners of the stock of said company, and some of us have become or may hereafter become liable as indorsers for said company, we hereby agree that if either of us shall suffer any loss at any time by being compelled to pay any of the notes so indorsed, we will be severally liable to contribute to the payment of such loss in proportion to the amount of stock held by us respectively." It was expected by those who signed the agreement that all the stockholders would sign it, but in fact a considerable number did not and there was no stipulation that it should be signed by all. Some who signed were at the time insolvent and others had since become so. On a bill in equity, brought after the failure of the company by one of the signers, who had paid a large amount upon indorsements for the company, to compel a contribution from the other signers of the agreement, it was held—

1. That the obligation assumed by each of the signers, upon a fair construction of the instrument itself, was to pay such proportion of the aggregate loss as his stock bore to the whole stock of the company, and not to the stock which was owned by the signers of the agreement.

2. That the proportion of each one's liability was to be determined by the amount of stock which he owned at the time of executing the agreement, and not by that which he might subsequently own, from time to time as the debts were incurred, or at the time when the company became insolvent.

3. That where one of the signers, soon after the agreement was made, sold his stock and ceased to be a stockholder, but gave no notice to the other subscribers that he should not consent to be holden for further liabilities, such signer was holden for losses upon liabilities incurred after he ceased to be a stockholder. But whether, if he had given such notice, he would have been holden; Quere.

4. That the share of each one being a fixed proportion of the whole loss, the proportion in which the solvent subscribers were to contribute was not affected by the insolvency of the others.

BILL in equity.

The petitioner and respondents, on the 7th day of November, 1854, were stockholders, and the petitioner the financial manager, of the Torrington Manufacturing Company, a joint stock corporation, located at Torrington in this state. The company was organized in 1852, with a capital of $11,500, divided into four hundred and sixty shares of $25 each. Previous to Nov. 7, 1854, the petitioner and several of the respondents had become obligated for the company as indorsers or sureties, and on that day, for the purpose of providing for an appor-

North *v.* Brace.

tionment among the stockholders of any loss that might result from these and other like liabilities, the following agreement was executed by the petitioner and the respondents.

"Whereas the undersigned are members of the Torrington Manufacturing Company, and owners of the stock of said company, and whereas some of us have become or may hereafter become liable as indorsers or sureties for said company, we do hereby agree, that if either of the undersigned shall suffer any loss, at any time, by being compelled to pay any of the notes or other paper so indorsed, we will be mutually and severally liable to the person or persons suffering such loss, to contribute to the payment of the same, in proportion to the amount of stock held by us respectively in said company. Dated at Torrington, the 7th day of November, 1854."

The petitioner was at that time the owner of ten shares of the stock of the company, and the respondents of the following number of shares severally, viz :—Rodney Brace, twenty-five shares; George W. Loomis, twelve shares; Daniel A. Grant, twenty shares ; Augustus Grant, forty shares ; Charles Hotchkiss, twenty shares; Frederick A. Griswold, twenty shares ; Rodney Pierce, ten shares ; George D. Wadhams, forty shares ; Albro W. Cowles, fifty-one shares; Victory C. Hart, twenty shares ; and Stephen M. Birdsall, twenty shares. The whole number of shares held by the signers of the agreement was two hundred and eighty-eight, leaving one hundred and seventy-eight shares held by stockholders who did not sign. The agreement was signed by the respondents at the request of the petitioner, with the expectation on their part that it would be signed by all the stockholders, though without any stipulation or representation from the petitioner that this would be done. After it was signed it remained in the hands of the petitioner, but was at all times subject to the inspection of any of the subscribers and of any members of the corporation.

The corporation went into insolvency in July, 1858, and proved to be deeply insolvent. After applying its assets to the payment of its debts there was found to be, on the 18th day of December, 1860, when the account was made up, an aggre-

gate of loss upon obligations of the company, for which the subscribers of the agreement of Nov. 7, 1854 were holden as sureties, of $20,627.51,—which sum was made up of payments which the several subscribers had made upon paper of the company on which they were holden. The balances due from the company to the several parties on account of these payments were as follows:—to the petitioner $6,090.28; to Brace $1,966.73; to Pierce $1,806.82; to Hotchkiss $1,355.12; to Cowles $1,524.76; to A. Grant $696.51; to Griswold $459.37; to Wadhams $6,227.92. Loomis, Birdsall and Hart, who were also subscribers and respondents, were insolvent at the time of subscribing and had ever since remained so. They had paid nothing. Brace, Cowles, D. A. Grant and A. Grant were then solvent, but had since become insolvent.

In consideration of the payment made by Brace, the petitioner had released him from all personal claim upon him for contribution under the agreement, retaining the right to make him a party to a suit with the other signers if necessary. Griswold, upon making the payment which he did, had been released from all claim under the agreement by the petitioner and all the other solvent subscribers. Wadhams, who owned forty shares of the stock of the company at the time of signing the agreement, sold twenty-four of the shares on the 12th of December, 1854, and the remaining sixteen shares on the 20th of February, 1856, and he was never a stockholder after the latter date. He had never considered himself liable upon the agreement for debts incurred after he left the company, but he gave no notice to the company, or to the other subscribers of the agreement, that he should not be longer holden on the agreement, until the 4th of February, 1858. Of the whole $20,627.51 paid by the subscribers for the company, $10,126.22 was upon debts incurred by the company after he ceased to be a stockholder.

The bill prayed that an account might be taken of the payments made by the several parties to the agreement, and that a decree be passed apportioning the loss among the parties according to the agreement. All the subscribers to the agree-

ment, other than the petitioner, were made parties respondent. Wadhams, Hotchkiss and Pierce appeared and filed answers, and all the other respondents were defaulted.

The superior court made a special finding of the facts and reserved the case for the advice of this court.

*G. C. Woodruff* and *Buel*, with whom was *Barbour*, for the petitioner.

1. The agreement of Nov. 7, 1854, was in all respects a valid and binding one. The fact which is found, that it was signed under an impression and belief that it would be signed by every stockholder, can not affect its binding character. There is no condition in the instrument that it should be so signed, and it is not found that there was any stipulation or agreement that it should be so signed, or any representation that it would be. Such a mere belief, induced by no promise or representation, can not affect its character as a binding instrument. Besides, it is found that the instrument remained in the hands of the petitioner open to the examination of all the signers, and they never made complaint that all had not signed. By their silence at the time they are now estopped from making the claim. Further, the validity of the instrument was recognized by all the signers in their discharge of Griswold from his liability under it.

2. The agreement is a contract of indemnity between co-sureties. All are to contribute to the payment of losses in proportion to their respective shares of the stock. They are to account and contribute as co-sureties. All were stockholders; all had a common interest, though in different proportions. By this agreement they became, as between themselves, partners. If one indorsed it was as if a company name was used; each was bound in proportion to his interest in the concern.

3. But the claim of the petitioner to contribution in this case does not arise merely out of the written agreement, but is founded upon a fixed principle of justice. Upon general principles of equity sureties are bound to contribute among themselves to a common loss, whether they are bound jointly, or severally, or jointly and severally, or whether bound by the

same instrument or by different instruments. *Deering* v. *Winchelsea*, 2 Bos. & Pul., 270. *Breckenridge* v. *Taylor*, 5 Dana, 110. *Weston* v. *Chamberlin*, 7 Cush., 404. 1 Parsons on Cont., 24, 26. 1 Story Eq. Jur., § 495. Contribution must in general be equal, but it may be regulated by express contract; 1 Story Eq. Jur., § 498; and here it was expressly provided that the contribution should be in proportion to the stock held by the signer.

4. The aggregate loss is to be apportioned among the *solvent signers*. It is specially provided in the agreement that the signers shall contribute to make up *any loss*. A loss by insolvency falls therefore within the letter as well as spirit of the agreement. But independently of this provision of the contract, it is a well settled rule of equity that contribution is to be enforced against solvent co-sureties, as if there were no others. 1 Story Eq. Jur., § 496. *Henderson* v. *McDuffee*, 5 N. Hamp., 38. *Hyde* v. *Tracy*, 2 Day, 492. *Mills* v. *Hyde*, 19 Verm., 59. *Peter* v. *Rich*, 1 Reps. in Cha., 35. *Cowell* v. *Edwards*, 2 Bos. & Pul., 268. It will not affect the question that some of the signers were insolvent at the time of signing. They might have been insolvent and yet their names have been worth obtaining. They owned stock in the company, were interested in sustaining it, and might pay if called upon. The instrument ought not to be made less effective and valuable by their signatures. But the rights of co-sureties do not depend upon the question whether the insolvency existed when the engagement was entered into, but whether it exists at the time when contribution is sought.

5. Mr. Wadhams, who is one of the solvent signers, is not relieved from the duty to contribute by reason of having sold his stock. The mere sale of his stock was clearly insufficient. The agreement was to contribute to the loss in proportion to the amount of stock then held by the signers. The proportion in which the contribution was to be made was therefore a fixed one, and being so it could not be changed by any signer at his pleasure, by his own mere act, without the consent of the others. If it were so any signer could work a great fraud on his associates. It is not enough that the others

knew that Wadhams had sold his stock.   If he had the power by his own act to terminate his obligation under the agreement, yet it was clearly his duty to give his associates notice, not merely that he had sold his stock, but that he should be no longer holden under the agreement.   The knowledge on their part that he had sold his stock, with a neglect on his part to give any such notice, would warrant the conclusion on their part that he understood himself to be still holden under the agreement, and that he intended to be so holden.   It is to be observed that the agreement makes no provision whatever for a right of withdrawal on the part of the individual signers, or for a change of the proportion of the liabilities of the signers by a change in the amount of stock which they might hold. It provides for a continuing liability, unlimited as to time, and for a fixed and unvarying rate of contribution.

6. Considering it as established that the solvent parties are to bear the loss, and that the sale of his stock has not discharged any signer from his liability, the question remains as to the proportion of the loss for which they are respectively liable.   The intent of the agreement, and the only proper construction of it, we claim to be, that the *whole loss* was to be apportioned among the signers, each paying such proportion of the whole loss as his stock bore *to the whole amount of stock owned by the signers*.   It is claimed however by the respondents that the true construction of the agreement is, that each signer was to contribute to the loss in the proportion which his stock bore *to the whole stock of the corporation*—that is, that the loss is to be apportioned among *all the stockholders* and not among the signers only.   This construction, we contend, is not consistent with the language of the instrument.   The parties bound themselves to contribute to the loss " in proportion to the amount of stock held *by them* " in the company, not in proportion to the amount held by them and others.   And it is manifestly contrary to the spirit and object of the instrument.   The object was to provide for a reimbursement to any one of the parties of the whole amount which he might be compelled to pay by reason of his indorsements for the company, he bearing his *pro rata* share of the loss and nothing

more. The agreement was intended to secure a distribution equally, among all the signers, in proportion to their several interests, of the burden and risk assumed by any one who should indorse the company paper. It was as if some one of their number was authorized by them to indorse in behalf of them all, they sharing the liability in proportion to their interests. It could never have been intended that the indorser should assume, not merely his *pro rata* share of the risk, but in addition to this a further risk to the extent of the stock not represented by the signers, for as to this portion of the risk he would have no security or indemnity whatever. The signers owned 288 shares of the stock. The whole number of shares was 460. According to the construction claimed by the respondents, if any indorser suffered a loss, he could recover of his associates in the agreement, including himself, only $\frac{288}{460}$th of the loss. The remainder he would be compelled to lose, in addition to his proportion as a party to the agreement. Such can not have been the intention of the parties, and clearly such is not equity. The signers of the agreement all intended that the *whole* loss should be borne by the signers, and in proportion to their interests *as between themselves*, and with no reference to the interests of stockholders who were not parties to the agreement.

*Hubbard* and *Kellogg*, with whom was *Catlin*, for the respondents.

1. The agreement of Nov. 7th, 1854 is the only foundation for a decree upon this bill. On that alone the petitioner must stand. And this agreement must be construed in equity according to the intent of the parties who signed it. It is found as a fact by the court below that they all signed it at the request of the petitioner, and in the belief that it would be signed by every stockholder in the corporation. The intent of the parties, then, in signing this agreement, was to limit the liability of each to the proportion of his individual stock as compared with the amount of the whole stock of the corporation. And the agreement itself, by its express terms, declares this to be the intention. Its language is, " Whereas, the un-

dersigned are members of the T. M. Company, and owners of the stock of said company." It does not read *owners of stock in said company*, as it should read if the intention had been that *only a part* of the stockholders should sign it; but its language is, "owners of *the stock of said company*," showing clearly that all the stockholders were to sign it to complete the contract. The remainder of the instrument corresponds exactly with this construction. The last clause declares that the parties shall be "liable to the person or persons suffering such loss, to contribute to the payment of the same *in proportion to the amount* of stock held by them respectively in said company." There is no ambiguity in the terms of the instrument; and if there is, the intention of the parties, as found by the court, must govern it.

2. It was the fault of the petitioner that the whole did not sign, or that he did not get those who did sign to make a new agreement, binding themselves to contribute to the loss in proportion to the whole amount of stock held by the actual signers. The agreement was signed by the others at the request of the petitioner, and he kept the paper afterwards. The *laches*, or neglect to get all the stockholders to sign, lies at his door and not at ours, and there is no equity in compelling us to pay the shares of the loss of those who did not sign.

3. Whichever construction is given to this agreement, whether the proportion be as to the whole stock of the corporation, or the amount of stock held by all the signers, the parties have by their contract fixed their respective contributions to the loss. The contract of contribution is express in this case, not implied. The parties agree, not to make up the whole loss to the one who suffers it, but "to contribute to the payment of the same in proportion," &c. Each man agrees what he will pay, and limits his proportion beyond which he can not be called upon. The case is entirely different from the cases of contribution in the books on which the petitioner relies. The doctrine of contribution is not founded on contract, but is the result of general equity, on the ground of equality of burthen and benefit. There is ordinarily no express contract between co-sureties. Each is holden for the whole to some

other party ; but if one co-surety pays more than his share, then, on general principles of equity, there is an implied contract between the co-sureties to contribute to the loss, and it is upon this implied contract that an action at law lies between two sureties. *Deering* v. *Earl of Winchelsea*, 2 Bos. & Pul., 270. *Craythorne* v. *Swinburne*, 14 Vesey, 164. 1 Parsons on Cont., 32. Burge on Suretyship, 1st Am. Ed., 384. 1 Swift Dig., 413. *Tyus* v. *De Jarnette*, 26 Ala., 280. But parties may make an express contract of contribution, as they have done in this case, which controls and governs the implied contract that would exist in the absence of an express one. These parties have fixed a different rule of contribution from the one implied by law in the ordinary case of co-sureties. All the cases lay down the doctrine that the parties may by their agreement qualify, or take themselves out of the reach of, the principle of the implied contract of contribution. *Deering* v. *Earl of Winchelsea*, supra. *Swain* v. *Wall*, 1 Reps. in Cha. 149. *Craythorne* v. *Swinburne*, supra. 1 Parsons on Cont., 37. Burge on Suretyship, 385. 1 Story Eq. Jur., § 498. *Andrews* v. *Callender*, 13 Pick., 484.

4. From this well settled doctrine it follows as a necessary result, that no one of these solvent parties is liable for the shares of the loss falling upon the insolvent parties. There is not a case in all the books, where there was an express promise of contribution, that decides that a solvent surety shall contribute more than the stipulated terms of his express contract prescribe, on account of the insolvency of a co-surety. The principle of contribution by which the solvent parties are to pay the shares of the insolvent, is the child of the implied promise ; it has no paternity in the express promise, unless it derives its life from some specific provision therein. A clause should have been inserted in this agreement, requiring the solvent parties to make up or contribute to the loss falling to the shares of those becoming insolvent, in order to bind these parties. *Swain* v. *Wall*, supra. *Craythorne* v. *Swinburne*, supra. *Pendlebury* v. *Walker*, 4 Younge & Coll., 424. 1 White & Tudor Lead. Cas. in Eq., (Hare & Wall.,) 101, *et seq.* But if they can be called on to contribute at all on the

shares of other insolvent subscribers, they certainly can not be liable for the shares of any except those who have become insolvent since the agreement was made. Three of these insolvent subscribers, Loomis, Birdsell and Hart, were insolvent when this agreement was signed. There is no case or principle of equity that makes a solvent surety responsible for an insolvent co-surety, except when the latter becomes insolvent after the obligation is incurred. Again, if these parties are bound to contribute at all for the shares of any of the insolvent subscribers, what rule is to govern in apportioning this part of the loss among the solvent subscribers? There is certainly no implied promise that one shall pay any more than another; and the express promise limits each man's liability to his own share. If there can be any claim in this case upon the solvent parties to pay the shares of the insolvent, it can only be this, that the solvent parties shall contribute to the loss of the insolvent parties' shares in equal proportions. North, with his ten shares, must pay as much as Hotchkiss with his twenty, or Wadhams with his forty shares, to make up this loss. But the whole claim of an implied obligation to contribute in this case is absurd in every view.

5. If, however, the views which we have presented are not sustained by the court, then we say that there are peculiar facts remaining which apply to the case of Wadhams, and effectually release him from all further liability. He sold and transferred his stock, most of it soon after this agreement was made. He sold in good faith, not to avoid this agreement; for in July, 1856, long after he had sold the last of his stock, the corporation was solvent and in as good condition as it had ever been. The stock was duly transferred; every member had notice. He did not consider himself liable after he sold his stock, nor did any of the other parties consider or claim that he was, so far as the finding shows. No notice at all was necessary. The parties all had notice by their own records, recorded also in the town clerk's office, which is notice to all the world. The language of the agreement has reference solely to the amount of stock held by each person when the loss should occur; not the amount held at the date of the agree-

ment.   Wadhams had no stock when any of this loss occurred. *Middletown Bank* v. *Magill*, 5 Conn., 28.   Ang. & Ames on Corp., § 616.   In the next place, if Wadhams is liable at all, he is liable only for his share of the loss accruing on obligations entered into while he was a stockholder, in proportion to the amount of stock he held when those obligations were contracted.   The whole amount of claims contracted by the corporation while Wadhams was a stockholder, as the finding of the court shows, is only $10,001.29, as paid by all these parties.   Of this amount Wadhams has already paid $4,663.95. None of the notes for which renewal notes were given after Feb. 4th, 1858, extended back to the time when he was a stockholder, and he is liable only in proportion to the stock he held in the company when the debts were contracted. From Nov. 7th, to Dec. 12th, 1854, his proportion would be on forty shares of stock; from Dec. 12th, 1854, to Feb. 20th, 1856, when he ceased to be a stockholder, his proportion would be on only sixteen shares.   It would be an outrage upon every principle of equity to compel Wadhams to contribute to the payment of claims incurred by the corporation after he ceased to be a stockholder.   The whole doctrine of contribution is founded on an equality of burden and benefit. He who shares the benefits is the one to share the burdens.   1 Story Eq. Jur., § 493.   *Deering* v. *Earl of Winchelsea*, supra.   In any view of the case, Wadhams has paid more than his proportion ; and he is entitled to a decree of contribution against all the subscribers who have paid less than their proportion of the debts contracted while he was a stockholder.

ELLSWORTH, J.   This case must turn essentially upon the proper construction of the writing of the 7th of November, 1854.   We will not say that the construction which we have adopted is entirely free from doubt ; and yet, after much consideration, we are on the whole satisfied that it is the correct one.

The writing, we think, is to be understood between the parties as if it had been signed by all the stockholders of the corporation, instead of a part of them—that is, each one binding

himself to the extent of his stock, or in the proportion of his stock to all the stock of the corporation, and no further.

We know from the motion, if the fact is important, that this was the belief and expectation of those who subscribed the instrument. They regarded such a general engagement as equal and fair among the stockholders, each agreeing to pay, if need be, his exact proportion of the loss. But aside from this extraneous matter, on which we do not particularly rely, we rest our opinion upon the obvious meaning of the writing itself, gathered in part from the expression " owners of the stock of the company," (not owners of *stock* merely, but owners of *the* stock, implying that *all* the stock is represented and that all the stockholders are speaking,) but more especially from the concluding words of the writing—" in proportion to the amount of stock held by us respectively in said company." These words give the proportion or limitation of the liability of each ; each agreeing to be liable as his stock bears proportion to all the stock in the company. If the writing does not mean this, it seems to us that there is no limitation whatever expressed in it ; for if the proportion is confined to the few who happened to sign the paper, and does not relate to all the stockholders of the company, no one who signed could have guessed what burthen he had assumed upon himself; for this would necessarily depend upon how many persons should sign after him, and those who were first applied to and signed, as they would do as a matter of course, might have to bear the whole loss, whereas we feel confident that each subscriber intended and understood that his liability was a *fixed quantity*, and so any one when he subscribed the writing had no occasion to know or inquire who else would or would not sign it. Each was willing to bear his share, and it was equal and fair that each should obligate himself in the proportion stated. The language of his undertaking is—I ought to bear my proportion in case of a loss, and therefore I am willing to bind myself to that extent.

Nor has the petitioner any ground of complaint that he can not now cast the great and onerous burthen of paying the debts of the company upon these four or five solvent respond-

ents.   He obtained their names under a clear and guarded
limitation to the contrary, and probably not one of them
would have signed the paper had he dreamed it would be con-
strued as now claimed by the petitioner.  Neither the lan-
guage nor meaning of the transaction sustains any such claim.
Possibly the petitioner has unfortunately misunderstood the
writing and thereby been led into error; but this can not avail
him here.   He is bound to know the law as well as the other
party, and having got only a part of the stockholders on his
paper, as he chose to stop there, he must abide the consequen-
ces of his neglect, and may not now cast upon them the duty,
as well as the risk of solvency, of others, some of whom were
in fact insolvent at the time.

This view of the writing renders it unnecessary for us to
decide what shall be done respecting the shareholders who
were insolvent at the time of signing or have become so since;
for, if no one is liable beyond his proportion of stock, he has
nothing to do with any other person's stock, whether such
person be solvent or insolvent.   His liability will not be in-
creased or diminished by any thing but the increase or dimi-
nution of the general loss, of which he must pay his proportion
at a fixed rate, to be determined solely by the amount of his
stock.

As a general doctrine of equity it is true, as claimed by the
petitioner's counsel, that where there is an entire debt or duty
owed equally by several, the solvent debtors must share
equally in any burthen thrown upon them by the insolvency
of a part of their number; but the doctrine is not applicable
to a case where there is no such entire duty, and where the
duty is specifically *limited* and *restricted*.   The effect of a lim-
itation is very well illustrated by the cases of *Deering* v. *Earl
of Winchelsea*, 2 Bos. & Pul., 270, and *Swain* v. *Wall*, 1 Rep.
in Cha., 149.   We can not express our own views better than
in the language of the Lord Chancellor of England in the first
case.   " If therefore by his contract a party may exempt him-
self from the liability, or that extent of liability, in which
without a special engagement he would not be involved, it
seems to follow that he may by special engagement contract

North *v.* Brace.

so as not to be liable in any degree." There is just such an engagement here, limiting the liability to the amount of each one's stock.

A question was made as to what was the time which we are to adopt in ascertaining the number of shares of stock held by each of the subscribers with reference to their liability on the agreement, whether the date of the writing itself, the 7th of November, or the date of the petitioner's indorsement of the company notes, or the time of the bankruptcy of the company. We think the date of the writing is the proper time. Whoever of the subscribers indorsed the company notes upon the en gagement of the writing, did it upon the credit of the writing as it was, and therefore upon the credit of those whose signatures were appended to it. It is quite possible that any subscriber might have the right, by giving notice to the other subscribers, to withdraw from the obligation as to after indorsements, and thereafter be free from liability to any one who should subsequently indorse the company paper upon the strength of the writing. But this was not done or attempted; and most certainly without it no subscriber could be allowed, by privately transferring his stock on the books of the company to a stranger, who would not by purchasing the stock become a party to the writing, to cast off the obligation resting upon himself as a party to it. Good faith as well as the law forbids this result. The subscribers ought to be considered as consenting to the continuance of the obligation until it is cancelled by some positive act, and due notice of the fact given to each subscriber.

Following out this view of the case, it appears, on the facts found by the court, that all the solvent subscribers to the writing have more than paid their proportions of the company debts. The shares of stock are four hundred and sixty, and the company debt is $20,627.51. This, divided among all the shares, if we have made no mistake in our computation, gives $44.84 to each share. Those of the subscribers who are insolvent, viz.: George Loomis, Stephen Birdsell, Victory Hart and Daniel A. Grant, each owning twenty shares, have paid nothing at all, and Augustus Grant, who owns forty shares, has paid only

$696.51, of the $1,792 which is his part to pay. These several balances are now due to the subscribers who have overpaid, and in the proportion in which they have overpaid. The petitioner therefore is entitled to recover from these delinquents his share, and G. D. Wadhams, one of the respondents, who has greatly overpaid his part, is entitled on his cross-bill to recover his proportion. These amounts can easily be ascertained by computation.

The result then is, that all the subscribers who have overpaid their proportions are entitled to have the bill dismissed; and as to the rest, the petitioner and Wadhams are entitled to decrees in their favor for their respective proportions of what is due them, upon the principles which we have stated.

Mr. Griswold we lay out of the case, for both the petitioner and Wadhams have released him. Mr. Brace has paid more than his share, and he too is released by the petitioner, and therefore the petitioner has no claim on him, though Wadhams would have had, so far as we can see, if Brace had not paid up his share.

In this opinion the other judges concurred.