[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
I. INTRODUCTION
On December 29, 1988, Anthony Cuomo, Lawrence Coassin, and James Greco closed a real estate deal designed to make them money. They could not have picked a more disastrous time. The Connecticut real estate market, famously prosperous in the late 1980's, fell into a calamitous slide a year or so after the ill-fated closing in this case. The parties, friendly enough when times were good, have spent the subsequent, less prosperous years embroiled in litigation. Cuomo, the plaintiff in the case at hand, alleges that he paid a disproportionate share of the debt incurred by the parties and seeks contribution from Coassin and Greco. Coassin and Greco, on the other hand argue both that Cuomo's claims are precluded by the provisions of a contract signed by the parties at the closing and that certain postcontractual actions by Cuomo preclude his recovery. For the reasons set forth below, I conclude that the contract in question does not bar Cuomo' s recovery but that Cuomo's postcontractual actions preclude the equitable remedies he seeks.
II. THE PROCEDURAL CONTEXT
On December 18, 1995, Cuomo commenced this action against Coassin and Greco by service of process. Cuomo is the sole plaintiff, and Coassin and Greco are the only defendants. Cuomo's Second Amended Complaint contains six counts. Three counts concern a promissory note signed at the December 29, 1988 closing, payable to one Charles F. Kelly (the "Kelly Note"). The remaining three counts concern a guarantee that Cuomo signed at the closing involving a separate promissory note payable to the First Federal Bank of Connecticut (the "First Federal Note"). First Federal subsequently changed its name to First Constitution Bank. Each count is directed against both defendants. Count I seeks contribution for money spent by Cuomo to settle the Kelly Note. Count II seeks contribution for money spent by Cuomo to satisfy the debt due on the First Federal Note. Count III claims that Cuomo is subrogated to the rights of Kelly on the Kelly Note. Count IV claims that Cuomo is subrogated to the rights of First Constitution on the First Federal Note. Count V alleges that the defendants have been unjustly enriched by Cuomo's settlement of the Kelly Note. Count VI alleges a similar unjust enrichment resulting from Cuomo's CT Page 7759 payments on the First Federal Note.
Coassin and Greco, jointly represented by counsel, asserted six special defenses prior to trial. Each special defense is directed against all of the plaintiffs counts. The First Special Defense alleges that the plaintiffs claims are barred by the applicable statutes of limitation, including Conn. Gen. Stat. §§ 42a-3-118(g) and 52-598a. The Second Special Defense asserts the doctrine of laches. The Third Special Defense alleges that the plaintiffs claims are precluded by the terms of a Shareholders' Agreement signed by the parties on December 29, 1988. The Fourth Special Defense asserts that the plaintiff is estopped from pursuing his claims by his postcontractual conduct. The Fifth Special Defense claims that the plaintiff's losses are the result of his own mismanagement. The Sixth Special Defense asserts that the money for which the plaintiff claims reimbursement was paid by him in consideration for unrelated settlements reached by the plaintiff with his various creditors.
The First Special Defense was addressed by the Court (Levin, J.) prior to trial. On October 30, 1998, Levin, J. denied the defendants' motion for summary judgment, holding that the plaintiffs first and third counts "are equitable in nature" and consequently "are not controlled by the statute of limitations on which the defendants rely." Levin, J. additionally held that, "The claim asserted in the second count did not accrue until October 2, 1993." For that proposition he cited ConnecticutAttorneys Title v. McDonough, 18 Conn.L.Rptr. 337, 342-43 (1996) (Sheldon, J.).
Notwithstanding the ruling of Levin, J., the defendants continue to claim the First Special Defense. After the close of evidence, the defendants agreed that the Fifth Special Defense could not be sustained. They thus claim the First, Second, Third, Fourth, and Sixth Special Defenses.
The case was tried to the Court over the course of several days in February 2000. At the conclusion of evidence, the parties agreed to bifurcate the post-trial briefing of the case and, as an initial matter, to submit post-trial briefs on the issue of liability. The final post-trial briefs were submitted on June 26, 2000. For the reasons set forth below, the Court determines that liability has not been established.
III. FINDINGS OF FACT.
The complex financial history of this case begins in 1987, when a group of investors entered into an agreement designed to convert a bowling CT Page 7760 alley located at 310 Washington Avenue in North Haven into a small shopping center. The bowling alley had been owned by a corporation known as North Haven Lanes, Inc. That corporation was, in turn, owned by Charles F. Kelly. A new corporation known as Northgate Development Corporation of Connecticut, Inc. was formed in order to develop the property. That corporation shortly changed its name to Northgate Development Corporation and will be referred to as "Northgate." Northgate was owned, in equal shares, by three investors: James J. Greco ("Greco"), an attorney; Greco's father, Joseph R, Greco; and Lawrence P. Coassin, also an attorney and a friend of Greco's since childhood. Greco and Coassin are the defendants in this case. Both were practicing attorneys in their late 20's at the time of Northgate's formation. Greco left the practice of law in 1989 and has since become chief executive officer of a small corporation. Coassin was, at the time, an associate with Robinson Cole, a prominent Hartford law firm. Coassin made partner in 1990 and continues to practice at Robinson Cole, concentrating in mergers and acquisitions. Both Greco and Coassin invested heavily in real estate in the late 1980's.
In the initial phase of the Northgate development, Kelly had a 50% interest in the property in question and Northgate (in which Greco, Coassin, and Joseph Greco each had a 1/3 interest) controlled the remaining 50%. These investors borrowed $1,050,000 from First Federal Bank. (First Federal would shortly change its name to First Constitution Bank, but, given the nomenclature of the note, the bank will be referred to as "First Federal.") On November 6, 1987, the investors collectively signed a note payable to First Federal in that amount, secured by a mortgage on the property. The proceeds of the note were used to retire the existing debt on the property and to allow Northgate to purchase its 50% interest in the property from Kelly.
By December 1988, the planned shopping center had been largely developed. The original investors now decided to restructure the deal. To do this, they brought in the plaintiff, Anthony Cuomo. Cuomo, a jeweler by trade, was an investor with considerable expertise in real estate development. He had invested in commercial real estate for many years. Although Cuomo lacked Greco and Coassin's specific expertise in the law, he was, in comparison to the defendants, a considerably older, more experienced, and wealthier person. Cuomo, Greco, and Coassin were all sophisticated investors and enjoyed a friendly personal relationship. Cuomo was represented by counsel at all relevant times, while Greco and Coassin chose to represent themselves.
A decision was made to allow Cuomo into the Northgate development and to buy Kelly and Joseph Greco out. Cuomo put $125,000 of his own money into the project and acquired a 50% interest in Northgate. After the CT Page 7761 buyout, Greco and Coassin each had a 25% interest in the corporation. The deal was closed on December 29, 1988.
The parties signed several documents at the closing. Four documents are of central importance to this case:
1. Mortgage Modification, Extension, Release and Assumption Agreement(the First Federal Note). This instrument increased the amount of the 1987 note to $1,130,000. The note was signed by Northgate, and Greco, Coassin, and Cuomo individually signed as guarantors.
2. Demand Unsecured Promissory Note. By this unsecured note, Northgate, Greco, Coassin, and Cuomo promised to pay to First Constitution Bank an additional $150,000.
3. Promissory Note (the Kelly Note). By this note, Northgate promised to pay to Kelly the principal sum of $205,000. Monthly installments were to commence on July 1, 1990. The balance was due and payable on December 31, 1991. In addition to Northgate, Greco, Coassin, and Cuomo signed individually. The note provides that their obligation shall be joint and several. In return for this note, Kelly transferred his interest in the property to Northgate. The note was secured by a mortgage on the property.
4. Shareholders' Agreement. The evidence establishes that this document was drafted by Cuomo's attorney following considerable negotiation among the parties. The words of ¶ 9, the brass ring which all parties to this litigation now seek to grasp, were hammered out with particular care and were accepted by all sides. The Shareholders' Agreement contains the following provisions of importance to this case:
(A) Northgate and its shareholders expressly agree "that this Agreement is in the Corporation's best interests and is fair to each of the Shareholders."
(B) Upon the sale or refinancing of the property, a priority distribution of $125,000 is to be given to Cuomo. Any remaining gain is to be divided among the shareholders "in proportion to their then-current ownership of Shares." (¶ 3.)
(C) The unanimous written consent of all the directors of the corporation is required before Northgate can "borrow funds . . . provided, however, that issuance of additional stock to a Contributing Shareholder as provided in paragraph 9 hereof shall require only the consent of the Contributing Shareholder." (¶ 8.) CT Page 7762
(D) Paragraph 9 is of sufficient importance that it must be quoted in full:
 9. Cash Contributions for Operating Deficits. Within ten (10) days after the end of any quarter in which the quarterly Operating Expenses exceed the quarterly Property Income, the President of the Corporation shall notify all of the Shareholders in writing (the "Deficit Notice") of the amount of the difference between the quarterly Operating Expenses and the quarterly Property Income (the "Quarterly Deficit"). Within twenty (20) days after receipt of the Deficit Notice, each Shareholder shall deliver to the President a certified check payable to the Corporation in an amount equal to each Shareholder's pro rata share of the Quarterly Deficit in proportion to his then-current ownership of Shares of the Corporation (the "Deficit Payment"). If any Shareholder fails to make timely payment in full of his Deficit Payment (the "Defaulting Shareholder"), the President shall notify those Shareholders who timely paid their Deficit Payment in full (the "Non-Defaulting Shareholders") of the aggregate amount of unpaid Deficit Payments (the "Unpaid Assessment"), and any Non-Defaulting Shareholders may make an additional contribution in the amount of the Unpaid Assessment (the "Additional Contribution). Any Non-defaulting Shareholder that makes an Additional Contribution (the "Contributing Shareholder") may elect in writing delivered to the President of the Corporation to have said Additional Contribution treated as an equity contribution, in which event the Corporation shall immediately issue and deliver to the Contributing Shareholder one share of capital stock of the Corporation for every $625.00 of the Additional Contribution made by such Contributing Shareholder. If more than one Non-defaulting Shareholder makes an Additional Contribution such that the aggregate Additional Contributions exceed the aggregate Unpaid Assessments, any such excess shall be used by the Corporation for working capital. If a Contributing Shareholder does not elect to treat his Additional Contribution as an equity contribution, the Corporation shall treat such Additional Contribution as a loan, and any such loan shall bear interest at the then-current rate payable by the Corporation on CT Page 7763 its most recent first mortgage loan.
 For purposes of this Article, "Operating Expenses" shall include the following:
 a. The Corporation's total expenses for operating and maintaining the Property including, without limitation: repairs, replacements, maintenance, cleaning, snow and trash removal, lighting, utilities, painting, insurance, security services, debt service and labor and personnel therefor; and
 b. All taxes, assessments, water, sewer and sewer use charges which are assessed, imposed or levied by any governmental authority, including the Town of North Haven, against the land, buildings, or improvements which may comprise any portion of the Property.
 For purposes of this Article, "Property Income" shall include all rental income received by the Corporation from lessees of any portion of the Property.
The Shareholders' Agreement governed the affairs of Northgate and its shareholders from December 29, 1988, to the eventual dissolution of the corporation on August 19, 1994. Greco was the President of the corporation throughout this entire period. Cuomo, Coassin, and Greco were the shareholders and directors.
As far as the evidence indicates, Northgate's affairs in the calendar year 1989 were uneventful. During this year, Greco maintained the checkbook, paid the bills, and managed the property. Cuomo presented some evidence suggesting that he made certain contributions to the corporation in 1989, but he expressly informed the Court that he seeks no reimbursement for those contributions in this action. His claims begin with the calendar year 1990.
In January 1990, Cuomo informed Coassin and Greco that he would like to manage the checkbook in 1990 as Greco had done in the previous year. He suggested that the three shareholders alternate this responsibility annually. Coassin and Greco did not object, and the checkbook and ledger were given to Cuomo. From that point on, Cuomo kept the checkbook and ledger in his jewelry store. Shortly after the transfer, he assumed sole responsibility for writing Northgate' s checks. CT Page 7764
At about the time that Cuomo assumed control of Northgate's checkbook, the local real estate market fell into a calamitous slide. Real estate values fell, vacancies increased, and existing tenants began to demand reductions in rent. In the early Spring of 1990, Cuomo made a "cash call" — that is, he informed Coassin and Greco that there was a shortfall in Northgate's cash flow and that an additional contribution from the shareholders was required. The Deficit Notice provision of ¶ 9 of the Shareholders' Agreement was not employed. No formal notice was issued by Greco, who remained President of the corporation. Rather, an informal call was made by but Coassin was able to contribute enough to enable Northgate to weather the immediate crisis. The formal requirements of ¶ 9 were entirely ignored in this transaction.
Later in the Spring of 1990, Cuomo made a second cash call. This was, again, an informal request. The provisions of ¶ 9 were not employed. This time, both Coassin and Greco — who were seeing numerous other real estate investments fall into financial difficulty as well — informed Cuomo that they had no additional funds to spare.
At this point, the testimonial evidence offered by the parties begins to differ markedly. To put the differences in a nutshell, Cuomo's theory of the case is that he was now compelled to pay Northgate's debts on his own and when he was sued by the noteholders (more of which in a minute) he was compelled to settle those legal actions on his own. Hence his claims for contribution, subrogation, and unjust enrichment. Coassin and Greco, in contrast, testified that Cuomo voluntarily took over the management of Northgate; managed Northgate, for all practical purposes, entirely on his own; told Coassin and Greco that he wanted to acquire their shares for nominal consideration; told them repeatedly that he (Cuomo) would be "responsible" for Northgate's obligations; caused Coassin and Greco to rely on these representations in settling their own financial affairs; and ultimately settled Northgate's debts on his own terms, throwing at least one unrelated obligation of his own into the mixture. The testimony of Coassin and Greco was credible on all of these points. In contrast, Cuomo's testimony was not credible. Coassin's and Greco's testimony, moreover, is corroborated by other credible evidence. The findings of the Court reflect this assessment of credibility.
In June 1990, after Coassin and Greco had explained that they could not meet Cuomo's second cash call, Cuomo told Coassin and Greco that he wanted to take over the property. He proposed that Coassin and Greco convey their shares in Northgate to him in exchange for nominal consideration. Cuomo told Coassin and Greco that he would assume responsibility for Northgate's affairs. He stated that nothing was expected of them other than their cooperation. He did not want to be "held up" by them. Coassin and Greco accepted this proposal and promptly CT Page 7765 informed Cuomo of their acceptance. These negotiations were conducted both over the telephone and in personal meetings.
Cuomo was represented in this matter by Attorney Joseph E. Faughnan of the law firm of Susman, Duffy Segaloff, P.C. Faughnan represented Northgate as well. On July 2, 1990, Faughnan wrote Greco the following letter:
Dear Jim:
 Anthony has advised me that you and Larry Coassin will be relinquishing your interest in the above property [Northgate].
 I will be happy to prepare any necessary documentation in connection with the same, and I would appreciate the opportunity to discuss the conveyance at your earliest convenience.
May I hear from you at your earliest convenience.
Coassin and Greco had several conversations with Faughnan and Cuomo after receipt of this letter. In response, Faughnan drafted a number of documents, which were delivered to Coassin and Greco by either Faughnan or Cuomo. One of these documents was a release, dated October 1990. Under this release, in exchange for "One Dollar ($1.00) and other good and valuable consideration," Coassin and Greco were to release to Cuomo "all rights, claims or demands" arising from the Shareholders Agreement. A second document was a stock purchase agreement, dated September 1990. In this document, Coassin and Greco were to agree to surrender all of their Northgate stock to Cuomo and, in return, Cuomo was to agree to assume the obligations of Coassin and Greco and hold them harmless. In addition to these documents, stock powers, dated October 1990, were prepared for Coassin and Greco, transferring all of their Northgate stock to Cuomo "for the sum of One Dollar ($1.00) and other good and valuable consideration." These documents accurately reflected the agreement that the parties had already made in principle.
Cuomo personally delivered a copy of the stock purchase agreement to Greco for his signature. Greco signed it and returned it to Cuomo. Greco never saw the executed copy again. The other documents prepared by Faughnan were never executed. The reason is that Cuomo was having difficulty in negotiating settlements with Kelly and First Federal. Cuomo asked Coassin and Greco to be patient while he worked these matters out, and they agreed. CT Page 7766
The terms of the Kelly Note, as mentioned, required interest payments to commence on July 1, 1990. No such payments were ever made. On September 20, 1990, Kelly's attorney, Anthony J. Elia, Jr., sent a letter to Northgate, Cuomo, Coassin, and Greco informing them that they were in default and demanding payment by October 9, 1990. On September 24, 1990, Greco wrote a letter in response, stating that he and Cuomo had been in touch with Kelly and had "both explained that Anthony is in the process of purchasing our interest in the property and would be assuming all obligations in exchange for which we would receive releases."
Cuomo and Faughnan were independently negotiating with First Constitution Bank concerning the First Federal Note. The Bank sent Northgate a demand letter on September 21, 1990. On October 10, 1990, a vice president of the Bank wrote to Faughnan that the Bank "will agree to execute releases of Messrs. Greco and Coassin . . . upon receipt of payments sufficient to bring the loans current." Faughnan sent a copy of this letter to Cuomo with a handwritten note in the margin. The note said, "Do not give this to Greco and Coassin." (Emphasis in orginal.)
The letter just quoted is insignificant in two different respects. First, its reference to "loans" establishes that Cuomo was negotiating more than simply the First Federal Note involved in this case. Although Cuomo was not forthcoming on the stand, the evidence shows that he had at least one other outstanding debt to First Constitution Bank, and was negotiating his multiple loans as a package. The second significance of this letter is conveyed in Attorney Faughnan's handwritten note. This note establishes what a multitude of other evidence in this case suggests. Cuomo and Faughnan were negotiating with the Bank on their own and keeping those negotiations secret from Coassin and Greco.
Cuomo's demeanor on the stand suggests that he is a very secretive person, and the evidence bears this out. Unhappily, because Cuomo was simply not forthcoming in his testimony (his memory on key details became very vague at convenient times) it is not possible to make detailed findings as to his actions during the period in question. This difficulty is compounded by the fact that Faughnan did not testify at all. In contrast, the testimony of Coassin and Greco as to what Cuomo and Faughnan told them was credible and supports the findings made in this opinion.
The evidence shows that on November 21, 1990, Attorney Elia prepared a writ, summons, and complaint on behalf of Kelly to sue Cuomo and Cuomo alone for nonpayment of the Kelly Note. This action was filed in the Superior Court as Kelly v. Cuomo, No. 308402 (J.D.N.H.). On November 26, 1990, Faughnan wrote to Elia that Cuomo had "reached a tentative agreement . . . with Coassin Greco concerning the future of the CT Page 7767 Northgate property." He asked if "Mr. Kelly would consider a stand-still agreement concerning payment of his note until 1993." The answer apparently was in the negative. On December 24, 1990, the Court (Fracasse, J.) granted Kelly's application for a prejudgment remedy, allowing an attachment of Cuomo's property in the amount of $250,000.
During the calendar year 1991, Cuomo continued to manage Northgate's affairs and negotiate with Kelly and First Constitution Bank. In all of these respects, he acted with complete independence, giving Coassin and Greco only that information which he chose to divulge. In the Spring of 1991, he transferred Northgate's checking account to his own bank, opening an account entitled "Anthony Cuomo dba Northgate Development Corp." (The "dba account"). From that point on, Cuomo paid all of Northgate's expenses out of the dba account. He at no time informed Coassin and Greco of the existence of the dba account.
This situation persisted through the first part of 1992 as well. Cuomo continued to negotiate with Kelly and First Constitution Bank on his own and to manage Northgate on his own, paying its expenses out of the dba account. In this year, however, Cuomo settled the obligations arising from the Kelly and First Federal Notes.
The Kelly Note was settled first. On June 15, 1992, Kelly and Cuomo signed a written Settlement Agreement. The Agreement states that the debt due Kelly as of that date amounted to $285,965.38, consisting of principal, interest, attorney's fees and costs, and late charges. (It appears that no principal or interest on the Kelly Note was ever paid.) To settle the case, Cuomo paid Kelly $57,965.38 in cash and executed a new promissory note payable to Kelly in the amount of $228,000. Kelly withdrew his pending action and released his mortgage on the Northgate property.
The First Federal Note was the second to be settled. On October 2, 1992, Cuomo, Coassin, and Greco signed a written Deed-in-lieu Agreement with First Constituion Bank. The Agreement states that the amount due "from the Obligors jointly and severally to Bank [is] the principal sum of $1,109,291.58 and interest of $0.00." The title to the Northgate property is conveyed to the Bank. Cuomo additionally agrees "to pay the sum of $200,000 in good funds to Bank at the time of closing." It is agreed that the value of the Northgate property "is not more than $731,000." The Agreement itself is not a release. In the event of full compliance, the Bank promises to furnish a release 12 months after the last transfer of property to the Bank. That release includes the obligations arising under the First Federal Note and the Demand Unsecured Promissory Note but is not limited to those debts. It additionally includes an unrelated debt to the Bank that Cuomo incurred on December CT Page 7768 1, 1989 by signing a promissory note in the amount of $75,000. Cuomo's testimony offered no details about this note and the debt arising from it. The cancellation of the indebtedness arising from that latter note was plainly part of the deal that Cuomo struck with the Bank.
Throughout the entire, protracted period of negotiations with Kelly and First Constitution Bank, Cuomo acted with complete independence of Coassin and Greco. The evidence makes it clear both that Cuomo wanted this independence and that this independence was at the heart of the deal that he struck with Coassin and Greco in 1990. This understanding was repeatedly asserted both by Cuomo and by his attorney. Cuomo repeatedly told Coassin and Greco that he would be responsible for Northgate's obligations and that they would not be responsible. These representations were repeatedly confirmed by Faughnan, who told Coassin and Greco that Cuomo was "stepping up to the plate" and was "going to take care of everything." In reliance on these repeated representations Coassin and Greco did not participate in the negotiations with either Kelly or the Bank. They subsequently signed the closing documents with the Bank in reliance on these representations.
The Deed-In-Lieu Agreement was executed on October 2, 1992. On October 13, 1992, Dana Friedman, one of Cuomo's attorneys, sent Greco and Coassin the following letter:
 Enclosed is a closing binder as to the October 2, 1992 Deed-In-Lieu transfer of the 310 Washington Avenue, North Haven, property to First Constitution Bank. As indicated by the Closing Statement (Index #1) it cost $214,371.29 (plus legal fees to my firm of $7,500.00, or a total of $221,871.29), all paid by Anthony, to accomplish the give back. I assume you will be contacting Anthony shortly to discuss contribution towards all or a portion of this sum.
Please feel free to call if you have any questions.
The letter just quoted was a complete surprise to Coassin and Greco, since its ""assumption" of contribution was completely at odds with the repeated prior representations of both Cuomo and Faughnan. Coassin called Friedman and cursed. Friedman replied, "Don't shoot the messenger." On November 6, 1992, Coassin wrote Cuomo the following letter:
 We recently received a letter from Attorney Dana Friedman outlining in excess of $200,000 in costs expended to settle Northgate. As you know from our conversations prior to the First Constitution CT Page 7769 closing, we had agreed to split the cost of the title insurance policy with you. We relied on this understanding when we agreed to settle with First Constitution. It was my understanding that when you settled with First Constitution the cash payment you made related to several properties. We never agreed to make any payments above our share of the title policy. In connection with that understanding, I have authorized Lisa Mendillo to deliver a check to your office in the amount of $250.00 this week.
 If the foregoing is inconsistent with your understanding, please call me at your earliest convenience. Thank you again for helping us to resolve this matter.
Copies of the letter just quoted were sent to Greco and Attorney Friedman. Significantly, Coassin and Greco never heard from Attorney Friedman again. Cuomo made no response. On December 2, 1992, Coassin saw Cuomo at a closing and brought the matter up. Cuomo responded only with silence. In fact, Cuomo said nothing concerning the subject for almost three years, until October 3, 1995, when one of his attorneys sent Coassin the demand letter immediately preceding this lawsuit.
By the time the 1995 demand letter was sent, another significant event had occurred. Northgate was but one component of a substantial real estate portfolio that Coassin and Greco had compiled in the late 1980's. The same real estate crash that afflicted Northgate affected these other properties as well. At the same time that the Northgate property was failing, Coassin and Greco saw the other properties in their would-be empire failing as well. To their credit, they did not declare bankruptcy but instead worked out an arrangement with their creditors. By stretching their resources to the limit and binding themselves to heavy loan obligations for years to come, they managed to borrow the sum of $300,000 from Advest Bank. This sum was then used to pay off Coassin's and Greco's many creditors. Although some distinctions were made between individual creditors, some of which were more intransigent than others, most creditors received about six cents on the dollar.
In connection with this transaction, Coassin and Greco were required to submit complete schedules of their outstanding debts to Advest Bank. The entire purpose of this exercise was to rid Coassin and Greco of their hitherto outstanding debt in exchange for their willingness to undertake the new loan from Advest Bank. Consistent with this responsibility, they submitted lengthy schedules of debt to Advest Bank and on December 15, 1994, executed a Closing Affidavit stating that, "There are no claims, CT Page 7770 litigation or proceedings, pending or threatened . . . except for those matters which are being released and/or settled with payments from the proceeds of the Loan." Coassin and Greco had absolutely no incentive to omit any debt or alleged debt from their submitted schedules. In fact, their incentive was quite the opposite. Since the point of the exercise was to rid them of their outstanding debt, they had every reason to include every conceivable debt in these schedules.
Neither Coassin nor Greco listed any of the claims that Cuomo now asserts in their respective schedules. This silence is overwhelming proof that, as of December 15, 1994, Coassin and Greco did not believe that Cuomo had any claim against them, either actual or contemplated. If they had any such belief, they surely would have listed the claim. Cuomo made much at trial of the fact that Coassin's and Greco's schedules are not, in fact, perfectly accurate. Some claims stated contain inaccuracies and a few fairly minor claims are omitted altogether. The credible evidence establishes, however, that these latter claims were in the process of being worked out with the creditors in question. Cuomo's claims, on the other hand, are different. Cuomo's claims potentially amount to hundreds of thousands of dollars. There is, moreover, no evidence, that any of the parties were discussing any resolution of Cuomo's claims on December 15, 1994. The reason for this is obvious. Coassin and Greco had no reason as of December 15, 1994 to know that Cuomo's claims even existed. Cuomo and his attorney had repeatedly assured them from 1990 to 1992 that he
(Cuomo) would be responsible for the Northgate debt and that they (Coassin and Greco) would not. In addition, neither Cuomo nor his attorney had made any response to Coassin's November 6, 1992 letter, which letter specifically asked for a response if Cuomo's understanding differed from Coassin's. By closing out their debts on December 15, 1994 in the way that they did, Coassin and Greco plainly relied on Cuomo's repeated representations to their detriment.
IV. DISCUSSION.
A. OVERVIEW
Each of Cuomo's causes of action is equitable in nature. See Crotta v.Home Depot, Inc., 249 Conn. 634, 640, 732 A.2d 767 (1999) (contribution); Westchester Fire Insurance Co. v. Allstate InsuranceCo., 236 Conn. 362, 371, 672 A.2d 939 (1996) (subrogation); Meaney v.Connecticut Hospital Association, Inc., 250 Conn. 500, 511, 735 A.2d 813
(1999) (unjust enrichment). Because of this fact, the Court must necessarily refer to the nature of the plaintiffs conduct in determining whether he has established his case-in-chief on any of the counts he asserts. CT Page 7771
The need for reference to the plaintiffs conduct has been repeatedly established by courts and commentators. Thus, the general rule governing actions for contribution is that, "Unless otherwise agreed, a person who has discharged more than his proportionate share of a duty owed by himself and another as to which, between the two, neither had a prior duty of performance, is entitled to contribution from the other, exceptwhere the payor is barred by the wrongful nature of his conduct." RESTATEMENT OF RESTITUTION § 81 (1937). (Emphasis added.) It is equally well established that a cause of action for contribution is not available to a person who has paid a debt as a mere volunteer. Johnstonv. Moeller, 93 Conn. 590, 595, 107 A. 566 (1919). Likewise, a cause of action for subrogation is available only to a person who has acted "not as a volunteer or in his own wrong." Home Owners' Loan Corp. v. Sears,Roebuck Co., 123 Conn. 232, 238, 193 A. 769 (1937). (Internal quotation marks and citations omitted.) The conduct of all parties is similarly relevant in a cause of action for unjust enrichment. Meaney v.Connecticut Hospital Association, Inc., supra, 250 Conn. at 512. Each of these rules is an application of the familiar equitable maxim that "One who seeks equity must also do entity." Gelinas v. Town of West Hartford,225 Conn. 575, 587, 626 A.2d 259 (1993).
One of the principle features of the celebrated decisions of Cardozo, J. was his sense that, while the common law focuses on justice at wholesale, equitable principles focus "on justice at retail." ANDREW L. KAUFMAN, CARDOZO 573 (1998). This point is emphasized in Meaney v.Connecticut Hospital Association, Inc., supra. Meaney explains that, "With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary . . . to examine the circumstances and the conduct of the parties and apply this standard."250 Conn. at 511-12.
Before the conduct of the parties in the present case can be reviewed in detail, however, one somewhat more conceptual point must be addressed. The parties have devoted much attention to the Shareholders' Agreement they executed on December 29, 1988. As mentioned, the defendants' Third Special Defense alleges that the plaintiffs claims are precluded by the terms of that Agreement. It has long been recognized that parties may exempt themselves from the reach of equitable doctrines by contract. North v. Brace, 30 Conn. 60, 72-73 (1861). If the parties have done so here, that is necessarily the end of the case. Even though the defendants' assertion is cast in terms of a special defense, it is clear that the plaintiff cannot establish his equitable case-in-chief if his claim is contractually precluded. (Recall § 81 of the RESTATEMENT OF RESTITUTION, supra, which allows contribution "[u]nless otherwise agreed.") For this reason, it must first be determined whether the CT Page 7772 contractual provisions in question here are, in fact, preclusive.
B. THE SHAREHOLDERS' AGREEMENT.
The defendants initially argue that the Shareholders' Agreement addresses the treatment to be afforded to shareholder advances and thus precludes the equitable relief that Cuomo seeks in this case. Their argument, as I understand it, is as follows: Paragraph 9 of the Shareholders' Agreement governs the situation in which the operating expenses of the corporation exceed the corporation's income and a shareholder makes payments from his own funds to cover the resulting deficit. If the contributing shareholder does not affirmatively elect to have his contribution treated as an equity contribution, the contribution is treated as a loan to the corporation. This, in the defendants' view, is exactly what happened here. It is common ground that Northgate faced a substantial operating deficit. Cuomo was a shareholder and a party to the Shareholders' Agreement at the time he made the payments in question. He did not affirmatively elect to have his contribution treated as an equity contribution. Therefore, the defendants argue, his contribution must be treated as a loan to the corporation. Cuomo, as it happens, has provided the defendants with some additional ammunition for this argument by maintaining certain accounting records and filing certain Federal income tax reports treating at least some of the contributions in questions as loans.
There is a nice question as to whether Cuomo's treatment of certain contributions as loans for Federal income tax purposes equitably estops him from seeking the judicial relief that he now seeks. In view of the ultimate conclusion reached below that he is not entitled to equitable relief in any event, this issue need not be considered. But the question as to whether Cuomo is contractually barred from obtaining equitable relief is a different question. To resolve that question, it is necessary to look at the contract. The provisions of the contract here do not support the defendants' analysis.
Paragraph 9 of the Shareholders' Agreement is a carefully drafted provision, designed to provide a mechanism whereby the three shareholders of the corporation — Cuomo, Greco, and Coassin — could cover the operating deficits of the corporation with predictable results. That mechanism calls for a specified series of notices, post-notice payments, and post-payment options. If there is an operating deficit, the President of the corporation sends a Deficit Notice. If the Deficit Notice is not followed by the necessary Deficit Payments, the President sends a second notice of Unpaid Assessment to the non-defaulting shareholders. At that point, a nondefaulting shareholder has the option of making an Additional Contribution. If the non-defaulting shareholder chooses to make such an CT Page 7773 Additional Contribution, the election provision of ¶ 9 becomes operative. At that point — and only at that point — the non-defaulting shareholder is on notice that if he does not affirmatively elect to have his Additional Contribution treated as an equity contribution, it will be treated as a loan.
The ¶ 9 mechanism is an extremely clear system if it is implemented in the first place. If the President sends the specified notices, the shareholders know exactly what their options are and how their exercise of those options will be treated. If the specified notices are given, no one can claim surprise. In fact, the very purpose of ¶ 9 is to avoid
surprise. But the use of ¶ 9 in a case like this, where no notices have been given in the first place, is to create a trap for the unwary. Whatever else may be said about ¶ 9, it was not drafted to create a trap for the unwary.
In this case, the President of the corporation sent neither a Deficit Notice nor an Unpaid Assessment Notice to the shareholders. Because of this inescapable fact, the election mechanism of ¶ 9 was never triggered. The defendants argue that the notice provisions of ¶ 9 were unimportant because Cuomo was in charge of the books at the time that the operating deficits occurred. This argument is quite beside the point. The provisions of ¶ 9 are unambiguous. Greco remained the President of the corporation. Moreover, Greco was a lawyer and was entirely familiar with the provisions of the Shareholders Agreement, including the triggering provisions of ¶ 9. In addition, Greco knew, at least in general terms, that Northgate had operating deficits and that Cuomo was making payments for these deficits out of his own resources. Greco was thus aware that he could trigger the consequences of ¶ 9 by sending the appropriate notices. He did not. Under these circumstances, it is inappropriate to conclude that Cuomo's payments must be construed as loans by virtue of ¶ 9.
In conceptual terms, the delivery of a Deficit Notice and an Unpaid Assessment notice is a condition precedent to the election provision of ¶ 9. "A condition precedent is a fact or event which the parties intend must exist or take place before there is a right to a performance." Lach v. Cahill, 138 Conn. 418, 421, 85 A.2d 481 (1951). Under the provisions of ¶ 9, both a Deficit Notice and an Unpaid Assessment notice must be given before an election can occur. If this is not done, the condition precedent has not occurred. In this case, the condition precedent did not occur, and the election provision of ¶ 9 never became operative. Consequently, the contractual provisions of the Shareholders' Agreement are not preclusive, and it is necessary to turn to the controlling equitable principles. CT Page 7774
C. EQUITY.
The equitable remedies that Cuomo seeks in this case are not matters of absolute right but ones which depend upon the equities and attending facts and circumstances of the case. Compania Anonima Venezolana deNavegacion v. Al Perez Export Co., 303 F.2d 692, 697 (5th Cir.), cert.denied, 371 U.S. 942 (1962). The equity of a party seeking an equitable remedy must ordinarily be clear and substantial. Equitable remedies such as those sought here cannot be invoked where they would work an injustice. Universal Title Insurance Co. v. United States,942 F.2d 1311, 1315 (8th Cir. 1991). A careful review of the credible evidence submitted in this case persuades me that to award Cuomo the remedies he seeks here would work a profound injustice.
The outcome of the case is determined by the findings of fact. If the facts were as Cuomo claims they are — i.e., that he was compelled to pay Northgate's debts on his own and that when he was sued by the noteholders he was compelled to settle those legal actions on his own — his claim for equitable relief would be compelling indeed. These are not, however, the facts established by the credible evidence in the case. The actual facts are quite different. As recounted above, Cuomo voluntarily took over the management of Northgate; managed Northgate entirely on his own; told Coassin and Greco that he wanted to acquire their shares for nominal consideration; told them repeatedly that he would be "responsible" for Northgate's obligations; caused Coassin and Greco to rely on these representations in settling their own financial affairs; and ultimately settled Northgate's debts on his own terms, throwing at least one unrelated obligation of his own into the mixture. Given these facts, Cuomo is not entitled to the equitable relief that he seeks.
It is important to understand that Cuomo did not take over the management of Northgate by default. Rather, he took it over as part of a arrangement that he made with Coassin and Greco. The basic terms of this arrangement were clear to all concerned. Cuomo would assume responsibility for Northgate's affairs. In return for this, Coassin and Greco would give Cuomo their cooperation. Although, with the benefit of hindsight, this might not seem to have been much of a bargain — in Cuomo's present view, all that he got out of the arrangement was the opportunity to pay Northgate's debts — Cuomo in fact gained a considerable benefit from the arrangement at the time. That benefit was the benefit of command.
In the summer of 1990, it was not a foregone conclusion that Northgate would fail. Cuomo, an experienced real estate developer, wanted the ability to manage the property unencumbered by Coassin and Greco. CT Page 7775 Holmes, J. memorably said that, "The only prize much cared for by the powerful is power. The prize of the general is not a bigger tent, but command." FRED R. SHAPIRO, THE OXFORD DICTIONARY OF AMERICAN LEGAL QUOTATIONS 184 (1993). So it was here. Cuomo's demeanor on the witness stand confirms what the evidence establishes in any event. He is a man who wants to be in charge of his financial affairs and doesn't want to disclose those affairs to others. In fact, Cuomo displayed a marked reluctance to reveal his financial affairs even when examined in court. He is plainly a secretive man who does not wish to be encumbered by the questions and intrusions of others. Cuomo thus gained a considerable benefit from arranging to be in charge of Northgate's affairs unencumbered by the active participation of Coassin and Greco. Since Cuomo proposed this arrangement and gained a substantial benefit from it, he is not in a position to ask that Coassin and Greco now contribute to the payments he made with the very independence for which he specifically bargained.
Cuomo's repeated misleading of Coassin and Greco on the very subject of this action shifts the equities against him to an even greater degree. As described above, Cuomo repeatedly told Coassin and Greco that he would be responsible for Northgate's obligations and that they would not be responsible. Significantly, these representations were repeatedly confirmed by Faughnan, his attorney, who told Coassin and Greco that Cuomo was "stepping up to the plate" and "was going to take care of everything." Coassin and Greco relied on these representations, much to their detriment. They did not participate in the negotiations with either Kelly or the Bank. They allowed Cuomo to include his unrelated personal debt in the resulting workout. Most significantly of all, they relied on Cuomo's repeated assurances that he would take full responsibility for Northgate's debts in settling their own financial obligations. Under these circumstances, Cuomo is simply not entitled to the equitable relief that he seeks.
The role of the court in an equitable action is to dispense "that which equity and good conscience" impel. Compania Anonima Venezolana deNavegacion v. A.J. Perez Export Co., supra, 303 F.2d at 699. In this case, whatever equity Cuomo can muster in his own behalf is not enough to tip the scales. Between Cuomo, on the one side, and Coassin and Greco, on the other, the equities are overwhelmingly in favor of Coassin and Greco. To grant what Cuomo seeks would produce, not equity, but inequity. The equitable remedies that Cuomo seeks "may not thus be corrupted." Id.
V. CONCLUSION.
The equitable relief that Cuomo seeks must be denied. Judgment shall CT Page 7776 enter in favor of the defendants on all counts.
 Jon C. Blue Judge of the Superior Court